LAKE INTERVALE HOMES, INC., A CORPORATION OF THE STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. THE TOWNSHIP OF PARSIPPANY-TROY HILLS, IN THE COUNTY OF MORRIS, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY, DEFENDANT-APPELLANT.

Argued November 5, 1958—Decided December 15, 1958.

See also 47 *N. J. Super.* 334, 136 *A. 2d* 57.

424

*Mr. Worrall F. Mountain, Jr.,* argued the cause for the defendant-appellant (*Messrs. Jeffers, Mountain and Franklin,* attorneys).

*Mr. Samuel A. Larner* argued the cause for the plaintiff-respondent (*Messrs. Budd, Larner and Kent,* attorneys).

The opinion of the court was delivered by

BURLING, J.   The defendant municipality appealed from a judgment of the Superior Court, Law Division, in the amount of $6,000 in favor of the plaintiff, representing a portion of the costs incurred by the plaintiff in installing water mains in certain areas of the Lake Intervale development in the municipality.   We certified the cause on our own motion prior to hearing in the Superior Court, Appellate Division.

On June 6, 1941 the Township Committee of Parsippany-Troy Hills approved a map of a proposed development of a tract of land owned by the Lake Intervale Corporation. The approved map divided the tract into over 300 lots, each with a frontage of approximately 50 feet and with varying depths from 100 to over 200 feet.   The map was duly filed in the Morris County Clerk's Office, July 11, 1941. Approval and recording were pursuant to the Old Map Act, *R. S.* 46:23–1 *et seq.* (since repealed *L.* 1953, *c.* 358, *p.* 1941,

§ 7, and supplanted by *N. J. S. A.* 46:23–9.1 *et seq.*). Thereafter the tract was assessed for purposes of taxation on an individual lot basis.

In 1941 the defendant had not enacted a zoning ordinance. Its first zoning ordinance was adopted in 1945, and as subsequently amended, places the Lake Intervale tract in a single-family residence zone, with a minimum lot area of 15,000 square feet and a minimum frontage requirement of 100 feet. Compliance with the zoning ordinance requires a combination of two lots to meet the area and frontage requirements.

In 1950, by virtue of a mortgage foreclosure sale, the Reid Development Corporation acquired title to 332 lots in the Lake Intervale tract. Up to 1950 the development had been unsuccessful. As part of its development plans the Reid Development Corporation made demands upon the municipality, which supplies its own water service, for extension of mains into portions of the Lake Intervale tract. In one such attempt the corporation succeeded in obtaining a 600-foot extension of the mains at the municipality's expense. *Reid Development Corp. v. Parsippany-Troy Hills Tp.*, 10 *N. J.* 229 (1952). In a later request for an additional extension of 3,060 feet the municipality's refusal to extend the mains was upheld. *Reid Development Corp. v. Parsippany-Troy Hills Tp.*, 31 *N. J. Super.* 459 (*App. Div.* 1954). The municipality's position that, in order to obtain building permits, the lot must conform to the zoning ordinance irrespective of any approval of lots as delineated on the filed map in 1941, was upheld in two cases: *Rodee v. Lee*, 14 *N. J. Super.* 188 (*Law Div.* 1951); *Herman v. Board of Adjustment, Parsippany-Troy Hills Tp.*, 29 *N. J. Super.* 164 (*App. Div.* 1953).

On June 1, 1954 the defendant adopted a subdivision regulation ordinance pursuant to the provisions of the Planning Act of 1953, *N. J. S. A.* 40:55–1.14 *et seq.* Article VI entitled "Improvements" reads:

"The subdivider shall install or guarantee the installation of such of the following improvements or portions thereof as may be required

by the governing body: (a) street grading and pavement [or] other surfacing; (b) gutters, curbs and sidewalks; (c) shade trees; (d) street lighting; (e) street signs; (f) water mains, culverts, storm sewers, sanitary sewers, or other means of sewage disposal, drainage structures, and all appurtenances to such facilities properly connected with approved systems of water supply, sewerage, and storm water drainage, as the case may be."

Plaintiff was incorporated in 1954. It acquired (the exact time and the grantor are not in the record) 30 lots in the Lake Intervale development, upon which it proposed to construct 15 dwelling houses. Eighteen of the lots were situated contiguous to each other on Fairway Place, an unimproved street. The other 12 lots were situated, in pairs, on various other unimproved streets throughout the development. Plaintiff's plan was to combine two lots, as delineated on the filed map—this to comply with the previously outlined zoning requirements.

Sometime in 1954 the plaintiff obtained building permits for the construction of four homes and commenced work. The municipality offers no explanation why these permits were issued.

By letter dated February 15, 1955, plaintiff wrote to the municipality offering to install certain street improvements at its own expense and inquiring as to the performance bond it should post. Apparently there was no reply.

Subsequently, in May of 1955, plaintiff had virtually completed the work on two houses and wrote to the municipality requesting an extension of water mains to service the houses. The defendant refused to extend the mains at its expense and countered the demand by declaring that certificates of occupancy would not be issued on the houses under construction and that no further building permits would be issued unless plaintiff submitted its plat for approval pursuant to the subdivision regulation ordinance. Defendant's primary purpose in demanding plat approval by the planning board and governing body was to impose upon the plaintiff the obligation to install, at plaintiff's expense, the main extensions, required by Article VI of the ordinance referred to previously. Defendant's basic position then and

now is that the Planning Act of 1953 and the ordinance are applicable to plaintiff's development and that they supply the authority to impose the ultimate cost of water main extensions upon the plaintiff.

A course of negotiations ensued. Apparently neither party was desirous of securing an immediate judicial determination on the controversy.

On October 4, 1955 the parties executed a non-waiver agreement by which plaintiff agreed to install the water mains and street improvements at its own expense initially. And, while not reduced to writing, defendant agreed to issue four certificates of occupancy and additional building permits. The pertinent portions of the agreement provide:

"The Developer agrees to bear the entire expense of introducing such roadways and water mains. If it shall hereafter and within a period of three years from the date hereof be determined by agreement, litigation or otherwise that the whole or any portion of the cost and expense of introducing such water mains should properly be borne by the Township, then the Township agrees at that time to reimburse the Developer to such extent and in such amount as shall be so determined, but without interest. In no event, however, shall this obligation of the Township exceed the total amount of $6,000."

"It being recognized by the parties hereto that a dispute exists between them as to who should be required to install mains and who should bear the cost thereof, it is the intention of the parties that none of the terms of this agreement or of any document to be presented herewith, nor the performance of any of the terms hereof, nor the execution and delivery of this agreement shall be for any purpose taken or considered as in any way affecting, changing, altering or having any effect upon the existing rights and obligations of the parties hereto with respect to such water mains and the cost of their installation."

Thereafter, plaintiff installed the water mains and street improvements.

No settlement of the narrowed liability issue was arrived at and plaintiff commenced the instant action for money damages in March 1956. Plaintiff's complaint alleged that the agreement of October 4, 1955 was procured under economic duress and sought in two counts, framed on a *quasi*-contract theory, damages for extension of water mains and

street improvements. The actual cost to plaintiff of the improvements was $12,021.60 for the mains and $40,427.51 for streets.

The court below, in a tripartite determination of the cause held: (1) that the Planning Act of 1953 supplies the statutory authority for a municipality supplying its own water service to impose, by ordinance duly adopted, the cost of extensions of water mains on the developer, 43 *N. J. Super.* 220 (*Law Div.* 1956); (2) but that in the instant case the subdivision control provisions of the Planning Act were inapplicable to plaintiff's development for the reason that the plat of the Lake Intervale tract had been approved pursuant to the Old Map Act and, in the absence of a re-subdivision of lots as delineated on the filed map, the subdivision control provisions of the Planning Act are prospective in operation only, 47 *N. J. Super.* 334 (*Law Div.* 1957); (3) that the agreement limiting liability for water main extensions to $6,000 was not executed under economic duress and was binding; that the parties agreed, previous to suit, that plaintiff was to pay for street improvements and that, since the only defense prior to suit relied upon by the defendant to support its position that it might compel the developer to pay for extensions of water mains was the Planning Act of 1953, judgment in the amount of $6,000 should be entered in plaintiff's favor. (Unreported decision of April 25, 1958)

The plaintiff has not cross-appealed from those portions of the determination below holding that plaintiff had agreed to install street improvements and limiting liability of main extensions, pursuant to the October 4, 1955 agreement, to $6,000.

█ The municipality raises an initial procedural question as to whether the instant action is not foreclosed by virtue of the fact that in lieu relief sounding in *mandamus* is the sole remedy to test the basic proposition of whether or not the municipality was under a duty to pay for the installation of the water mains. It is asserted that the plaintiff's installation of the mains followed by a suit for recovery of the

costs has the effect of circumventing the appropriations statutes, *R. S.* 40:2–29, *R. S.* 40:50–6, and the bidding laws, *R. S.* 40:50–1; *R. S.* 40:62–63. We recognize that the course pursued is pregnant with possibilities for abuse and that the developer will not ordinarily be permitted, after demand and refusal, to install the improvement and then bring an action for damages. But in the instant case the municipality expressly agreed that this course should be pursued. The sum and substance of the agreement was that the developer was to install the mains so that he would not be unduly delayed in completing the development, and that the question of ultimate imposition of costs was to be preserved for later settlement or suit within a three-year period. As *quid pro quo,* the municipality's liability, if any, was limited to the sum of $6,000.

The appropriations laws requiring advance budgeting were not violated by the agreement. In a *mandamus* proceeding the municipality could not argue that it had no duty to extend mains because no appropriation had been made therefor. The court could order an appropriation if the duty were otherwise found to exist, to be met by the means provided in the Home Rule Act. Nor can we find any facts which indicate that the spirit of the competitive bidding statutes was violated by the agreement. It must be kept in mind that the municipality's liability was, by the agreement, limited to $6,000, whereas the cost of the work performed amounted to $12,021.60. Thus, even assuming that the municipality would have had to advertise for bids in the event that they were compelled by order of the court to install the mains, it is highly unlikely that they would have received a bid as low as $6,000. The good faith of the parties is not impugned, nor is the fact that the cost of the work done was reasonable. See *Hudson City Contracting Co. v. Jersey City Incinerator Authority,* 17 *N. J.* 297 (1955). Under these circumstances the instant action is maintainable. The remaining issues are: (1) whether the Planning Act of 1953 is applicable to an undeveloped tract of land where a map indicating proposed subdivision

lines was approved and filed pursuant to the Old Map Act; (2) whether the Planning Act of 1953 affords a statutory authorization for a municipality operating its own water service to compel an extension of water mains at the developer's expense; (3) whether the municipality's position that it was under no duty to extend its water system, under the facts of this case, may be sustained, assuming a negative answer to either of the first two inquiries.

The court below, as did the Appellate Division in a recent case, *Goldstein v. Lincoln Park Planning Board*, 52 *N. J. Super.* 44 (*App. Div.* 1958), held that approval and recording of a subdivision map under the Old Map Act created rights which render the subdivision control provisions of the Planning Act inapplicable. In both decisions it was held that the Planning Act is prospective and not retroactive in application. Moreover, it was stressed that a "subdivision" which, as defined in the Planning Act, includes "resubdivision," *N. J. S. A.* 40:55-1.2, is necessary to trigger the operation of the Planning Act, and that a combination of lots, preserving the previously approved lot lines as delineated on the filed map, could not be categorized as "resubdivision." *Contra: Clauss v. Postma*, 32 *N. J. Super* 147 (*Law Div.* 1954).

We have reservations about the breadth of the proposition thus stated. The essential difficulty with the above approach to the problem is that it assumes that the planning authorities must give conclusive effect to the lot lines delineated on a map filed under the Old Map Act, irrespective of whether any further action was ever taken by the developer to bring his proposed development into fruition. In our view, where the owner of a tract of land filed a subdivision map and has taken no further action prior to the time of the adoption of a subdivision regulation ordinance, then the lot lines delineated on the old map may be ignored for purposes of determining whether a "subdivision" exists under *N. J. S. A.* 40:55-1.2 of the Planning Act of 1953.

The Old Map Act was hardly more than a conveyancing aid. *Magnolia Development Co. v. Coles,* 10 *N. J.* 223, 226 (1952).

■ Basically the act was intended (a) to provide a method for officially filing maps so that future conveyancing instruments might refer to a parcel of realty by reference to the lot numbers as delineated on the map, and (b) to set forth sound engineering standards for maps so filed so as to avoid surveying errors; for a discussion of this character of statutes, see *Reps, "Control of Land Subdivision by Municipal Planning Boards,"* 40 *Cornell L. Q.* 258, 259 (1955); *Note,* 29 *Ind. L. J.* 408, 408–409 (1954). The statute, *R. S.* 46:23–1 *et seq.,* as it finally emerged in the legislative revision of 1937, was a compilation of a series of statutes which antedated the zoning and planning enabling acts in this State. The original source of the Old Map Act may be traced back to the Conveyancing Act of 1898, *L.* 1898, *c.* 232. The bulk of the other sources was amendments to or supplements of the Conveyancing Act. See *L.* 1908, *c.* 91; *L.* 1910, *c.* 83; *L.* 1912, *c.* 242; *L.* 1913, *c.* 77; *L.* 1914, *c.* 12; *L.* 1917, *c.* 217; *L.* 1924, *c.* 49; *L.* 1927, *c.* 54; *L.* 1928, *c.* 178. There was no compulsion for a developer to obtain approval of a map except as a condition precedent to filing, nor were there any penalty provisions for subdividing a tract differently than as approved. (*R. S.* 46:23–6 did provide that the municipality as a condition to approval might require an agreement that no further subdivision of lots as delineated on the map would be made and that building lines would be respected. The agreement when recorded was deemed to be a covenant running with the land, *R. S.* 46:23–7.) The Old Map Act contained what might be termed rudimentary planning features with respect to the width and location of new streets and highways. *R. S.* 46:23–2(*e*); *R. S.* 46:23–3.

■ The subdivision control provisions of the Planning Act of 1953, *N. J. S. A.* 40:55–1.14 to 1.25 stand out in marked contrast. Where a municipality has established

a planning board and adopted a subdivision regulation ordinance, developers must obtain plat approval as a condition precedent to recording, *N. J. S. A.* 40:55–1.14; *N. J. S. A.* 40:55–1.17, and as a condition precedent to the sale of any lands within a subdivision not classified as a minor subdivision under the local ordinance, *N. J. S. A.* 40:55–1.23. Penalties are provided for non-compliance. *N. J. S. A.* 40:55–1.23.

■ The Planning Act further provides that:

"*N. J. S. A.* 40:55–1.20. Conditions to be required in acting upon plats; reservation of location and extent of school sites, public parks and playgrounds.

In acting upon plats the planning board shall require, among other conditions in the public interest, that the tract shall be adequately drained, and the streets shall be of sufficient width and suitable grade and suitably located to accommodate the prospective traffic, to provide access for firefighting equipment to buildings and to be co-ordinated so as to compose a convenient system, conforming to the official map, or if there is no official map, relating properly to the existing street system. Where the planning board after hearing has adopted portions of the master plan with proposals regarding the street system within the proposed subdivision, the board may require that the street shown conform in design and in width to the proposals shown on the master plan. * * *

The planning agency shall further require that all lots shown on the plats shall be adaptable for the intended purposes without danger to health or peril from flood, fire, erosion, or other menace.

If portions of the master plan contain proposals for drainage rights-of-way, schools, parks, or playgrounds within the proposed subdivision or in its vicinity, or if standards for the allocation of portions of subdivisions for drainage rights-of-way, school sites, park and playground purposes have been adopted, before approving subdivisions the planning board may further require that such drainage rights-of-way, school sites, parks or playgrounds be shown in locations, and of sizes suitable to their intended uses. The governing body or the planning board shall be permitted to reserve the location and extent of school sites, public parks, and playgrounds shown on the master plan or any part thereof for a period of one year after the approval of the final plat or within such further time as agreed to by the applying party. * * *"

"*N. J. S. A.* 40:55–1.21. Improvements prerequisite to approval of plats; performance guarantee

Before final approval of plats the governing body may require, in accordance with the standards adopted by ordinance, the installation, or the furnishing of a performance guarantee in lieu thereof, of any or all of the following improvements it may deem to be

necessary or appropriate: street grading, pavement, gutters, curbs, sidewalks, street lighting, shade trees, surveyor's monuments, water mains, culverts, storm sewers, sanitary sewers or other means of sewage disposal, drainage structures, and such other subdivision improvements as the municipal governing body may find necessary in the public interest."

It is readily perceived that there is little overlap in the purposes of the Old Map Act and the Planning Act of 1953. The latter act was designed to afford municipalities desiring the advantages of its provisions to enact comprehensive regulatory standards which would facilitate sound and orderly future municipal growth along preconceived lines, in short a planned community growth.

Mr. Justice Heher, in the landmark case of *Mansfield & Swett, Inc., v. Town of West Orange,* 120 *N. J. L.* 145 (*Sup. Ct.* 1938), upholding the constitutionality of the original Planning Act, *R. S.* 40:55–1 *et seq.*, observed:

"To particularize, the public health, safety, order, and prosperity are dependent upon the proper regulation of municipal life. The free flow of traffic with a minimum of hazard of necessity depends upon the number, location, and width of streets, and their relation to one another, and the location of building lines; and these considerations likewise enter into the growth of trade, commerce, and industry. Housing, always a problem in congested areas affecting the moral and material life of the people, is necessarily involved in both municipal planning and zoning. And it is essential to adequate planning that there be provision for future community needs reasonably to be anticipated. We are surrounded with the problems of planless growth. The baneful consequences of haphazard development are everywhere apparent. There are evils affecting the health, safety and prosperity of our citizens that are well-nigh insurmountable because of the prohibitive corrective cost. To challenge the power to give proper direction to community growth and development in the particulars mentioned is to deny the vitality of a principle that has brought men together in organized society for their mutual advantage. A sound economy to advance the collective interest in local affairs is the primary aim of municipal government." (120 *N. J. L.*, at *pages* 150–151)

The "baneful consequences" of premature platting following the 1920 land boom in this State have been comprehensively outlined in two exhaustive studies by the New Jersey State Planning Board: *Land Subdivision in New Jersey* (1938);

*Premature Land Subdivision A Luxury* (1941). These are some of the findings and conclusions of the 1938 report:

"1. Unoccupied or sparsely occupied platted lands in New Jersey total nearly 185,000 acres, an acreage sufficient to supply over a million 50 x 120 foot lots. Approximately 60 per cent of this land is entirely unoccupied. The balance is scatteringly developed to the extent of from one to five houses per city block.

2. The total area of these reserve or prematurely platted lands is more than half as great as the area of all the developed urban land in the State, including lands occupied by dwellings at a density of six or more houses per city block, industry, business, parks and institutions, and all other urban uses.

3. The number of vacant lots is sufficient to accommodate an additional population of 4,000,000 people—equivalent to the entire present population of the State. Even at the 1910–1930 rate of population increase, unlikely to continue indefinitely, it will take from 50 to 100 years to absorb the amount of land already laid out into building lots. And the above figures do not include the large number of vacant lots scattered through more developed urban territory and make no allowance for additional land platting continuously in process.

❋        ❋        ❋        ❋        ❋        ❋        ❋        ❋

5. Over two thirds of the 185,000 acres of platted land has been subdivided since 1915. Much of it is the product of local land booms occasioned by major transportation improvements such as new bridges and tunnels across the Delaware and Hudson Rivers, and by improved access to shore points. Not included in this acreage are thousands of acres of platted land inherited from earlier land booms and now gone back to brush." (*Land Subdivision in New Jersey, supra, pp.* 9–10)

These reports also point up the then existing enormous tax deficiency problems created by such prematurely subdivided lands at the municipal level of government. The further direct implications of the land subdivisions under the Old Map Act were, as of 1938, as follows:

"(a) If the whole of the surplus platted acreage is fully improved and occupied as now laid out, excessive costs of street improvements alone will amount to from 125 to 150 millions of dollars.

(b) If so developed and occupied, there will be the further excessive public costs of inefficient servicing and maintenance; extensive street widenings and extensions; and of belated acquisition of necessary lands for recreational, school, and other public purposes.

(c) For many municipalities, the wasteful improvement and servicing of this land as now platted will mean the narrow choice

between bankruptcy and extensive rural slums finally resulting in bankruptcy." (*Land Subdivision in New Jersey, supra, pp.* 10–11)

These, of course, are in addition to the public health, safety and welfare problems created by improperly planned or improved developments.

In light of these social and economic facts the conclusion urged by the plaintiff, *i. e.,* that the filing of a map under the Old Map Act, without more, creates in the owner of the tract vested rights which render the Planning Act ineffectual in curbing the Topsy growth of municipalities, appears unreasonable. Especially so when it is considered that we are obligated by the Planning Act, *N. J. S. A.* 40:55–1.3, and the Constitution, *N. J. Const.* 1947, *Art.* IV, *Sec.* VII, *par.* 11, to construe the statute in such a manner as to afford the municipality the fullest powers to deal with land regulation.

The pattern of a community may change radically in the course of several decades. And, as our knowledge of the causes of slum conditions, overcrowding, traffic problems, even juvenile delinquency increases, the ideas of proper community growth change even more radically.

What may have been deemed an adequate proposed development in 1941 from a planning standpoint may be grossly inadequate today in view of the changes in the surrounding areas of the development and in view of changes in the science of municipal planning itself. Rights in land must give way to greater needs of the community implemented by reasonable exercise of the police power.

As stated in *Collins v. Board of Adjustment of Margate City,* 3 *N. J.* 200, at *page* 206 (1949):

"* * * All property is held in subordination to the police power; and the correlative restrictions upon individual rights—either of person or of property—are incidents of the social order, deemed a negligible loss compared with the resultant advantages to the community as a whole, if not, indeed, fully recompensed by the common benefits."

It is firmly settled in this State that lot lines as delineated on a map filed under the Old Map Act must give way to

a subsequent exercise of the zoning power increasing area requirements. *Ardolino v. Florham Park Board of Adjustment*, 24 *N. J.* 94 (1957); *Herman v. Board of Adjustment, Parsippany-Troy Hills, supra; Rodee v. Lee, supra.* Subdivision control, like zoning, is an implementing tool of planning. We can perceive no reason for concluding that filing of a map under the Old Map Act does not prevent application of the one power but it does the other. Both are necessary to abolish the social disease of blight, the essential difference between them being the difference between inoculation and surgery.

The above conclusion is supported by the case of *Magnolia Development Co. v. Coles*, 10 *N. J.* 223 (1952). In the *Magnolia* case the developer had submitted for approval a plat plan meeting the requirements of the Old Map Act. The governing body, by resolution disapproved the plan because the developer would not install desired improvements. It thereafter adopted two ordinances providing a penalty if land in the borough was sold by reference to a plat plan prior to the approval of the plan by the borough and requiring a surety completion bond for certain improvements. Since the borough did not have a planning board or a subdivision regulation ordinance, we held the attempt to regulate the developer was *ultra vires*. But in so doing Mr. Chief Justice Vanderbilt expressly pointed out that

"* * * Here the defendant was not without power to impose conditions on the development of new areas within its boundaries, but such powers have been granted to municipalities by *R. S.* 40:55-1 *et seq.*, relating to planning boards, and *R. S.* 40:56-1 *et seq.*, relating to local improvements. These statutes, while granting much power to a municipality in the development of land within its boundaries, also contain many provisions for protecting the property owner and they do not constitute an authorization for a municipality to exercise the powers therein conferred without compliance with the provisions and procedures therein prescribed. * * * If the defendant borough desires to exercise its police powers with respect to the regulation of new developments within its boundaries, it must do so within the framework of the statutes provided for such purposes, namely, *R. S.* 40:55-1 *et seq.*, and *R. S.* 40:56-1 *et seq., supra.*" (10 *N. J.*, at *pages* 227-228.)

Thus, at least where virgin lands are concerned, the Planning Act of 1953 is applicable to instances where a plat plan of the tract had previously been approved and filed pursuant to the Old Map Act. But a problem emerges with respect to situations where the owner of a filed plat plan under the Old Map Act has taken additional steps other than merely filing the plat plan. Where, for instance, there have been conveyances of lots, developed or undeveloped, to individual owners pursuant to the filed plan vested rights in the nature of non-conforming uses may be created. *Cf. Rodee v. Lee, supra.* The resulting problem is to determine under what circumstances a tract may be classified as undeveloped and hence to require the exercise of planning powers. This problem is to be distinguished from the one to which the Planning Act specifically addresses itself— *i. e.,* the problem of classifying subdivisions as "minor" so as to exempt them from the provisions of the local ordinance. *N. J. S. A.* 40:55-1.14 provides in part:

"Any such ordinance may exempt from the requirement of local municipal approval, subdivisions wherein the number of new lots is less than a designated number, or plats that do not involve new streets, or such other classes of subdivisions as such ordinance shall designate. In all cases involving such exempted subdivisions, the mayor or planning board chairman, as the case may be, and the municipal clerk shall certify the exemption on the plat, deed, or instrument to be filed with the county recording officer. *L.* 1953, *c.* 433, *p.* 2176, § 14."

The model ordinance of the State Planning Board suggests that division of a tract into more than three lots be treated as non-exempt. *State Planning Board, A Guide for the Preparation of Municipal Land Subdivision in Control Ordinances* (MPM-4 August, 1956), *page* 3. What may be appropriate regulation where a small virgin tract is subdivided into a small number of lots may not be appropriate where a small tract is carved out of a larger tract for purposes of further subdivision, where the larger tract has already assumed certain characteristics. The question of the applicability of the Planning Act of 1953 to situations

where further action occurred, other than the mere filing of a plat plan under the Old Map Act, is one which is in need of legislative clarification. It is worthy of note that the two reports of the State Planning Commission, previously referred to, classified undeveloped subdivided lands into two categories, *i. e.*, those tracts which were totally unoccupied and those which were sparsely occupied, the latter being defined as tracts containing one to five houses per block. See *Land Subdivision in New Jersey, supra,* at *pp.* 9, 19. A similar quantitative line for purposes of determining the applicability of the Planning Act (if that be the advisable manner of treatment) is one that should only be drawn by the Legislature.

The factual picture in the instant case is fragmentary. We do not know how many of the 332 lots, originally owned by Reid Development Corporation, are presently owned by third parties, or what the pattern of conveyancing and construction has been. But it is unnecessary to resolve the question of whether, under the facts of this case, the Planning Act applies. The municipality is apparently completely satisfied that, from a planning standpoint, the development has proceeded along sound lines. They did not, nor do they now, urge that all desired improvements were not installed. Rather, it is the municipality's position that the applicability of the Planning Act and the ordinance adopted pursuant to the act provides the authority for imposing the ultimate cost of the extensions of the water mains upon the developer. For purposes of the disposition of this argument we can assume that the Planning Act applies to plaintiff's development.

It is contended by the plaintiff that irrespective of the applicability of the Planning Act, that act does not purport to empower a municipality to impose upon a "subdivider" the entire cost of an extension. Rather, it is urged that it is the pre-existing body of statutory and decisional law dealing with the relations of municipally operated water utilities and their consumers which deter-

mines whether the developer or the municipality should, under the circumstances, pay for the water service improvement.

To put it another way, the question posed is whether the Planning Act provides an additional statutory pillar to support a municipality's effort to compel a developer to install water mains at the developer's expense, especially when the course adopted would be unauthorized if the municipality treats the improvement under the statute and case law dealing directly with such improvements. But that question need not be resolved here. *N. J. S. A.* 40:55–1.21 provides that "before final approval of plats, the governing body may require, in accordance with *standards* adopted by ordinance," the installation of improvements specified in the statute or the furnishing of a performance guaranty. (Emphasis supplied)

██ The ordinance here is completely devoid of standards relating to the imposition of costs. Rather, it purports to impose the total cost upon every "subdivider" without regard to the benefits conferred by the improvement. It is undisputed that other property owners contiguous to plaintiff's property and abutting on the extensions made in the instant case will ultimately benefit therefrom. Moreover, plaintiff is a relatively small-scale developer and some of the building lots were scattered in isolated pairs throughout the tract, so that at times an extension along an entire street was necessary in order to service one house in the block. We need go no further than to hold that in its application to the facts of this case the ordinance is clearly arbitrary and discriminatory.

Therefore, insofar as the result urged by the municipality is posited on the powers granted by the Planning Act, it cannot be sustained. And for the same reason the result cannot be sustained by the body of statutory or decisional law relating to extensions of water service by a municipality. For instance, while the course was not pursued by the municipality here, *R. S.* 40:56–1(*k*) permits a municipality operating its own water system to extend its mains as a

local improvement. When that course is followed the land-owners benefited share the expenses in accordance with the benefits received. Any discrimination in imposing such benefits would be invalid.

■ Ordinarily a municipal water utility (not subject to the Board of Public Utility Commissioners) can refuse a request to extend its mains if such refusal represents a fair and reasonable exercise of governmental discretion. *Reid Development Corp. v. Parsippany-Troy Hills Tp.,* 10 *N. J.* 229 (1952); *Reid Development Corp. v. Parsippany-Troy Hills Tp.,* 31 *N. J. Super.* 459 (*App. Div.* 1954); 56 *Am. Jur., Waterworks, sec.* 61, *p.* 966; *Annotation,* 48 *A. L. R. 2d* 1222 (1956). But, as stated by Mr. Justice Heher in the first *Reid* case, *supra*:

"The provision of water for the public and private uses of the municipality and its inhabitants is the exclusive province of the local agency; and it is elementary that the exercise of the power must be in all respects fair and reasonable and free from oppression. There can be no invidious discrimination in the extension of the service thus undertaken by the municipality as a public responsibility. Equal justice is of the very essence of the power. Impartial administration is the controlling principle. The rule of action must apply equally to all persons similarly circumstanced. There is a denial of the equal protection of the laws unless the water service be available to all in like circumstances upon the same terms and conditions, although the rule of equality may have a pragmatic application." (10 *N. J.,* at *page* 233)

The municipality, as we have previously stated, has adopted no standards or regulations to which applicants for service of the kind in question may turn for guidance as to the manner in which the discretion will be exercised. This omission may be contrasted with the statute regulating the duty of private utilities in this regard and with the regulations of the Board of Public Utility Commissioners adopted thereunder with respect to the cost of extensions of mains when requested by developers. *Board of Fire Commissioners of Fire District No. 3, Piscataway Tp. v. Elizabethtown Water Co.,* 27 *N. J.* 192 (1958). Under the pertinent rule of the Board, a developer who is ordered

to make a deposit to cover the original cost may recoup the entire sum over a prescribed period of time if the revenue produced from the new consumers meets certain requirements. *Board of Public Utility Commissioners, Tentative Draft of Regulations for Electric, Gas, Water and Sewer Utilities, Reg.* 408.1, *p.* 39 (*October* 11, 1958).

It does not seem amiss to suggest that even where a municipality operating its own water system does not have a subdivision regulation ordinance (which clearly requires standards to be set forth) that promulgation of general standards to regulate the matter of extensions would greatly facilitate the task of judicial appraisal of the exercise of the governmental discretion.

As a further affirmative defense to the instant action the municipality, by amended answer dated October 4, 1956, asserted that it was acting within the bounds of lawful discretion in refusing to extend the mains for the reasons that:

"(a) It has neither funds nor a labor supply available for the purpose.

(b) There are many, probably hundreds, of homes and dwellings not now served by water mains and municipal water, located within the boundaries of the municipality, which are anxious to have such facilities, and which in all fairness should receive priority of treatment over the plaintiff."

Having set up the defense in the pleadings, there is a complete absence of supporting proof in the record. In this posture, the defense of reasonable exercise of discretion in refusing to extend mains, to the extent that it relies upon lack of funds or labor supply and the existence of persons who should have preference with regard to extensions, was not sustained as a matter of fact.

The municipality has made no alternative demand for an equitable apportionment of the costs of the extension in relation to the benefits received, although such a defense was open to it under the terms of the agreement. Its position throughout has been that it was under no obligation to absorb any of the cost of the improvement. The appor-

tionment issue not having been raised by the municipality, a remand on our own initiative will not be ordered.

The judgment appealed from is affirmed.

*For affirmance*—Chief Justice WEINTRAUB, and Justices HEHER, WACHENFELD, BURLING, JACOBS, FRANCIS and PROCTOR—7.

*For reversal*—None.