SAUL BRAZER AND GLORIA BRAZER, HIS WIFE, PLAIN-
TIFFS-APPELLANTS, v. BOROUGH OF MOUNTAINSIDE,
IN THE COUNTY OF UNION, A MUNICIPAL CORPORA-
TION, AND THE PLANNING BOARD OF THE BOROUGH
OF MOUNTAINSIDE, IN THE COUNTY OF UNION,
DEFENDANTS-RESPONDENTS.

Argued October 20, 1969—Decided March 16, 1970.

*Mr. Irvine B. Johnstone, Jr.* argued the cause for plaintiffs-appellants (*Messrs. Johnstone & O'Dwyer,* attorneys; *Mr. Johnstone,* of counsel; *Mr. Frank T. Swain,* on the brief).

*Mr. Charles J. Irwin* argued the cause for defendants-respondents.

The opinion of the court was delivered by

HALL, J. Plaintiffs' application for approval of a subdivision of their land in the Borough of Mountainside was granted by the borough Planning Board, but only on condition that they reserve, and show on their subdivision plat, a right-of-way across the property for the future extension, as shown on the borough's master plan, of an existing street which now dead-ends at plaintiffs' sideline. Any building permit was directed to be denied until this was done. The decision of the board was affirmed by the municipal governing body on plaintiffs' appeal from the imposed condition, taken pursuant to *N. J. S. A.* 40:55–1.19. They then instituted this suit in lieu of prerogative writ in the Law Division challenging the municipal action, which resulted in a judgment for the defendants. 102 *N. J. Super.* 497 (1968). The Appellate Division affirmed, 104 *N. J. Super.* 456 (1969), "substantially for the reasons expressed" in the Law Division opinion, and we granted certification. 54 *N. J.* 111 (1969).

This is not the usual subdivision case involving large scale development of a sizable tract of raw land in single ownership. The situation here, shown by the various maps in evidence, is quite miniscule and factually rather simple, but involves legal considerations of importance.

Plaintiffs' land comprises a single parcel fronting 200 feet on the northerly side of U. S. Highway 22 and extending approximately 500 feet in depth. The width narrows to about 140 feet midway of the depth. A large, old dwelling is located about 200 feet back from the highway. The rear half of the premises is vacant land. It is typical of a number of properties in the west end of the borough fronting on the north side of the highway, see *Wilson v. Mountainside,* 42 *N. J.* 426, 438 (1964) — old houses situated on separately

owned parcels of some size and varying depths, with the rear portions undeveloped and without access to existing streets.

Several years ago the borough Planning Board adopted a master plan pursuant to *N. J. S. A.* 40:55–1.10 to 1.12 of the Planning Act (1953), the map of which showed several additional proposed streets north of the highway in this part of the community. This area, beyond the highway parcels just mentioned, is hilly and substantially developed. The existing streets serving these developments are devious and patternless, with only circuitous connection to the through streets to the east which intersect or cross the state highway. It is apparent from the master plan map that the primary purpose of these proposed streets is to provide a street system for the developed northwestern area of the community which will, consistent with the terrain, more readily permit expeditious movement of local traffic and emergency and service vehicles and furnish more direct access to the principal streets of the borough. Since the proposed streets largely run through the rear of the various highway properties previously mentioned, their construction would also, quite incidentally perhaps, open up and give access to these portions for building development on an individual rather than a large scale basis. It is a fair inference that the routes were purposely selected to run through vacant land in order to reduce the expense of construction.

The principal one of these proposed streets would run roughly parallel to the highway, passing east and west through the rear half of plaintiffs' property and those of numerous other similar owners, eventually connect some 1000 feet or more to the east with an existing short street called Long Meadow, and then proceed further eastward across the rear of other similar properties to join near the highway a present street called Pembrook Road. It was designated as a "primary collector street" to collect traffic from numerous minor and secondary streets in the area, existing or proposed. As far as the record discloses, none

of this proposed street has been constructed or laid out except the small portion to which we are about to refer.

In 1966, after the adoption of the master plan, third parties obtained subdivision approval of another parcel of land fronting on the highway slightly to the west of plaintiffs' property. The subdivision comprised eight lots with access by a new 50 foot street, called Camelot Court, commencing on the northerly side of the highway, running northerly about 200 feet (this portion of the street was not shown on the master plan as a proposed street), then curving to the east and running parallel to the highway some 300 feet along the line of the previously mentioned proposed street shown on the master plan, and dead-ending in a temporary *cul-de-sac* at the westerly sideline of the rear half of plaintiffs' property. Camelot Court was so constructed at the sole expense of this subdivider as an improvement pursuant to *N. J. S. A.* 40:55–1.20 and –1.21 of the Planning Act and the borough subdivision ordinance. We assume that, as so constructed, it has been dedicated and accepted and is now part of the municipal street system, maintained by the borough. See *Kligman v. Lautman,* 53 *N. J.* 517, 536 (1969).

Plaintiffs' original subdivision application was to create the rear half of their property as a single separate lot approximately 250 feet by 140 feet. During the course of the proceeding before the Planning Board, they supplemented their application to request approval of a further division of the rear half into two lots, roughly on a northeast-southwest axis, which would be of about equal area but irregularly shaped. Each would "front" on the dead-end of Camelot Court for a distance of 25 feet. The record is not entirely clear whether the board and the governing body formally passed on this supplemental application as well, but we shall assume that they did in order to dispose of the entire matter since essentially the same problem is involved whether the subdivided portion is to comprise one lot or two.

As we indicated at the outset, the board approved the subdivision—and all subsequent tribunals have concurred—only on the condition that plaintiffs reserve a 50 foot right-of-way for the proposed eastward extension of Camelot Court through the property, as laid out on the master plan map. No requirement was imposed that plaintiffs improve and pave the reserved right-of-way. This demonstrates that everyone involved was proceeding on the implicit, but unexpressed, assumption that plaintiffs have the legal right to use the 50 foot dead-end of Camelot Court on their westerly sideline as abutting owners for access (a matter which we will discuss later).[1] What was obviously intended is that plaintiffs would be required to offer irrevocably to dedicate this 50 foot strip, which amounts to about 20% of the area of the rear half of the property, for construction of the proposed street sometime in the future, without compensation either for the loss of its use in the meantime or for its value at any time. This also means that they could utilize the remainder only in the light of that fact, *i. e.,* they would not be able to build upon the strip and setback and other yard requirements would have to be computed and arranged with reference to it. Since the right-of-way would pass through the southern part, the practical effect would be that only the northern portion

---

[1] The building permit act, *N. J. S. A.* 40:55–1.39, requires (subject to the alleviative provision of *N. J. S. A.* 40:55–1.40) that, before a permit may issue, the building lot must abut a suitably improved existing street or one shown on a filed map, giving suitable access to the proposed structure.

It may also be noted that, even though two subdivided lots would each only have half of the 50 foot dead-end as frontage, they might be said not to violate the local zoning ordinance requireing 100 foot minimum lot width because Art. VIII, sec. 4(a)1 of the subdivision ordinance provides that the required width shall be determined, not by the distance along the abutting street, but by the width at the front or rear building line. In the view we take of the case, this matter need not be definitively resolved.

would constitute a usable building lot and two lots could not be created.[2]

We will first consider the matter on the hypothesis on which it has been presented throughout, *i. e.,* that the proposed subdivision did not make reservation of the right-of-way necessary because there would be street access by use of the dead-end. The judicial affirmance of the municipal action was bottomed on defendants' contention, renewed here, that requiring the reservation of the right-of-way is authorized by the Planning Act, *N. J. S. A.* 40:55–1.20, as implemented by the borough's subdivision ordinance, even though the subdivision did not make the extension necessary. The following portion of this section, especially the emphasized sentence, was relied upon:

"In acting upon plats the planning board shall require, among other conditions in the public interest, that . . . the streets shall be of sufficient width and suitable grade and suitably located to accommodate the prospective traffic, to provide access for fire-fighting equipment to buildings and to be co-ordinated so as to compose a convenient system, conforming to the official map,[3] or if there is

[2] The master plan map shows another proposed street running north and south which would cross plaintiffs' proposed subdivision and terminate upon intersecting Camelot Court within the property. While this was adverted to before the Planning Board, that body did not also condition subdivision approval on reservation of a right-of-way therefor. If this further requirement had been prescribed, it would seem the remaining land would not satisfy the zoning ordinance requirements of 15,000 square feet minimum area for even one building lot.

[3] While we would think it would make no difference on the legal question involved here, it may be noted that Mountainside does not have an official map as provided for in *N. J. S. A.* 40:55–1.30 *et seq.,* which would conclusively establish the location of present and pro posed streets. See *Kligman v. Lautman,* 53 *N. J.* 517, 535 n. 2 (1969). The subdivision ordinance, Art. IV, sec. 13, says that the tax map shall be considered the official map, but this document, intended for tax assessment purposes, would show only existing streets. A master plan map, essentially an impermanent, advisory and suggestive document, has, as far as proposed streets are concerned, only whatever implications are to be derived from the statutory section now being quoted.

no official map, relating properly to the existing street system. *Where the planning board after hearing has adopted portions of the master plan with proposals regarding the street system within the proposed subdivision, the board may require that the street shown conform in design and in width to the proposals shown on the master plan. . . .*

 ✻  ✻  ✻  ✻  ✻  ✻  ✻  ✻

"If portions of the master plan contain proposals for drainage rights-of-way, schools, parks, or playgrounds within the proposed subdivision or in its vicinity, or if standards for the allocation of portions of subdivisions for drainage rights-of-way, school sites, park and playground purposes have been adopted, before approving subdivisions the planning board may further require that such drainage rights-of-way, school sites, parks or playgrounds be shown in locations and of sizes suitable to their intended uses. The governing body or the planning board shall be permitted to reserve the location and extent of school sites, public parks and playgrounds shown on the master plan or any part thereof for a period of one year after the approval of the final plat or within such further time as agreed to by the applying party. Unless during such one-year period or extension thereof the municipality shall have entered into a contract to purchase or instituted condemnation proceedings according to law, for said school site, park or playground, the subdivider shall not be bound by the proposals for such areas shown on the master plan. This provision shall not apply to the streets and roads or drainage rights-of-way required for final approval of any plat and deemed essential to the public welfare." (Emphasis supplied).

The borough subdivision ordinance, Art. VIII, sec. 1, implements the authority given in the italicized sentence of the statute by providing:

"Major streets and thoroughfares or parts thereof, designated as existing or proposed on the Master Plan Map where they lie within the boundaries of the plat should be shown on the plat substantially as they are shown on the Master Plan Map, or official map, so as to conform to the intent and purposes thereof."

The sum and substance of defendants' position is that the mere fact of a subdivision application automatically brings the quoted statute and ordinance provisions into play, thereby permitting the imposition of a reservation of a proposed street shown on a master plan map, regardless of the need of the subdivided lots for the new street. The position is dramatically illustrated by the municipal view

that, even if plaintiffs' property were to be subdivided on a north-south instead of an east-west axis, to form two lots extending the full depth of the property with each lot fronting on the highway and needing no other access, the municipality could still require the same reservation of the proposed street through the rear of both lots. They concede, however, that if no subdivision application at all were made, the municipality would have to purchase or condemn the strip for the proposed street.

Plaintiffs, on the other hand, contend that these statute and ordinance provisions are intended to be applicable, and can have validity, only where the proposed street shown on the master plan map bears a realistic relation to or is reasonably made necessary by the subdivision. The corollary urged is that, where, as here, such is not the case, a requirement of right-of-way reservation solely because the proposed street is shown on a master plan amounts to a taking of private property without compensation. We think plaintiffs' position is the correct one.

Of course, there has never been any doubt in this state that the statutory provisions authorizing a municipal requirement of approval of subdivision plats, including the design and location of streets, *N. J. S. A.* 40:55–1.20, as well as of the installation by the developer of streets and other specified kinds of improvements, *N. J. S. A.* 40:55–1.21, are valid exercises of the police power. The foundation for this proposition was laid in the leading early case of *Mansfield & Swett, Inc. v. West Orange,* 120 *N. J. L.* 145 (Sup. Ct. 1938). It is implicit in subsequent decisions of this court. *Lake Intervale Homes, Inc. v. Parsippany-Troy Hills,* 28 *N. J.* 423 (1958); *Levin v. Livingston Township,* 35 *N. J.* 500 (1961); *West Park Ave., Inc. v. Ocean Township,* 48 *N. J.* 122 (1966).

But the plain rationale of these cases is that, as was said in the context of off-site improvements in *Longridge Builders, Inc. v. Planning Board of Princeton Township,* 52 *N. J.* 348, 350 (1968), a subdivider may be com-

pelled only to assume a cost "which bears a rational nexus to the needs created by, and benefits conferred upon, the subdivision. . . See *Lake Intervale Homes, Inc. v. Parsippany-Troy Hills*, 28 *N. J.* 423, 441–443 (1958)." Beyond that, Planning Board impositions, although purportedly authorized by the Planning Act or the local ordinance, amount to impermissible exactions.[4]

The constitutional basis of the nexus requirement is illustrated by *Grosso v. Board of Adjustment of Millburn Township*, 137 *N. J. L.* 630 (*Sup. Ct.* 1948), a case analogous to the instant situation. There plaintiff sought a use variance for a lot in a residential zone. While the application was pending, an ordinance was adopted amending the township's official map to show a proposed extension of an existing street occupying all of plaintiff's property. The variance was denied for this reason. The court held that the township

---

[4] It seems clear that the legislature, in adopting the subdivision regulation provisions of the Planning Act, especially *N. J. S. A.* 40:55–1.14 to –1.22, had primarily in mind large scale developments of sizable tracts of vacant land, requiring numerous interior streets, utilities and other improvements, without adequate provision for which the impact upon ultimate lot purchasers and the community as a whole would be very great. Indeed, the act flatly says that a subdivision is not subject to regulation when no new streets or roads are involved, *N. J. S. A.* 40:55–1.2, and authorizes the local ordinance to exempt from the requirement of approval, installation of improvements and the like, "subdivisions wherein the number of new lots is less than a designated number, or plats that do not involve new streets or such other classes of subdivisions as such ordinance shall designate." *N. J. S. A.* 40:55–1.14. The Mountainside ordinance, Article IV, sec. 4 and Article V, sec. 1(b), implements this authority through a categorization of "major" and "minor" subdivisions, the latter, as defined, being exempt from the approval requirement and all that goes with it. See *Kotlarich v. Ramsey*, 51 *N. J. Super.* 520, 527–532 (App. Div. 1958). The miniscule subdivision here did not meet the ordinance exemption because plaintiffs' plat is in conflict with a provision of the master plan by reason of the proposed street extension. We make mention of this aspect at this point simply to indicate that, while the statute and local ordinance may cover the small as well as the large subdivision, it is evident no greater powers are granted local authorities merely because small subdivisions are, in certain instances, included within the reach of regulation.

action, without condemning and paying for the lot, amounted to an unconstitutional taking and directed that the variance application be considered and decided on its merits without regard to the map amendment. See also to the same general effect, *Battaglia v. Wayne Township Planning Board,* 98 *N. J. Super.* 194 (App. Div. 1967).[5]

*Lomarch Corp. v. Mayor of Englewood,* 51 *N. J.* 108 (1968), demonstrates the same underlying thesis. Plaintiff sought tentative approval of a subdivision of a 16 acre tract. While the application was under consideration, the municipality amended its official map to show the whole of the tract as land reserved for park use under the authority of *N. J. S. A.* 40:55–1.32 (similar to the previously quoted second paragraph of *N. J. S. A.* 40:55–1.20 of the Planning Act), permitting such a reservation to extend for a period of one year after final approval of the plat. This court held that, in order for the reservation to be effective, the municipality must make payment of adequate compensation to the landowner for the temporary taking and deprivation of use.

██ Therefore the provision of *N. J. S. A.* 40:55–1.20 and the implementing ordinance relied upon by defendants here — "[w]here the planning board after hearing has adopted portions of the master plan with proposals regarding the street system within the proposed subdivision, · the board may require that the street shown conform in design and in width to the proposals on the master plan" — is validly applicable solely where the proposed street shown on the master plan is necessary to serve and benefits the subdivided lots. Conversely, the quoted sentence must be construed to

---

[5] The trial court in the instant case, 102 *N. J. Super.* at 505–506, thought *Battaglia* inapposite and actually favored defendants because it did not involve a subdivision and the court there had said by way of *dictum,* 98 *N. J. Super.* at 198, that the conditions sought to be imposed would appear to be valid if required as conditions of subdivision approval. Without going into detail, we would dispute the correctness of the statement.

mean only that, where a new street or streets are necessary by reason of and to serve the subdivided lots, the Planning Board may require the location and design of such streets to conform to proposals shown on the master plan. Otherwise, the municipality, if it desires to implement the master plan, must pay compensation to the landowner for the right-of-way it desires to reserve for future use.[6]

So under the hypothesis that the proposed extension of Camelot Court through plaintiffs' property is not necessary or rationally related to the subdivision, because they have physical access by and are legally entitled to use the dead-end thereof, defendants may not condition subdivision approval upon a reservation of the right-of-way through the property for the proposed street extension and the lower tribunals were in error in holding to the contrary. To the same general effect elsewhere, see *People ex rel. Exchange National Bank v. Lake Forest,* 40 *Ill.* 2d 281, 239 *N. E.* 2d 819 (1968) ; but cf. *Ayres v. City Council of City of Los Angeles,* 34 *Cal.* 2d 31, 207 *P.* 2d 1, 11 *A. L. R.* 2d 503 (1949).

But, in our view, this case is not ended by the conclusion just stated. At oral argument we raised the question whether plaintiffs' two subdivided lots could legally use the dead-end of Camelot Court for required access and requested supplemental memoranda.

---

[6] In this connection it may be noted that *N. J. S. A.* 40:55–1.20 of the Planning Act does not authorize a one year reservation of proposed streets shown by the master plan within a proposed subdivision as it does with respect to school sites, public parks and playgrounds. (The official map act, *N. J. S. A.* 40:55–1.32, as amended *L.* 1967, c. 288, does authorize such a reservation with respect to proposed streets shown on the official map as well. See note 3 *supra*). In fact, the last sentence of section 1.20 says: "This provision [presumably the school site, park and playground reservation provision] shall not apply to the streets and roads or drainage rights-of-way required for final approval of any plat and deemed essential to the public welfare." The meaning and intent of the sentence is ambiguous. We take it defendants would urge it allows an indefinite and permanent reservation, which would amount to a taking now, and pursuant to *Lomarch, supra* (51 *N. J.* 108), would require the payment of full compensation presently to effect a valid reservation.

While the rule is sometimes said to be that a parcel abuts a street whether it be situated at the side or at the end of the street, *e. g.,* 10 *McQuillin, Municipal Corporations* § 30.55 (3rd ed. rev. 1966) ; 39 *Am. Jur.* 2d *Highways* § 161 (1968), it is a matter on which jurisdictions differ. See *Annot.* 73 *A. L. R.* 2d 652, 675–676. The question was first considered in this state in *Good Deal of Ivy Hill, Inc. v. Newark,* 32 *N. J.* 263 (1960). There Justice Francis collected the cases in other jurisdictions, going both ways, to which may be added *Janicki v. Lorek,* 255 *N. C.* 53, 120 *S. E.* 2d 413 (1961), where an owner of premises, the sideline of which ran along the dead-end of a street, was held not to be an abutting owner for purposes of access, and *Hofstra College v. Board of Trustees of Hempstead,* 145 *N. Y. S.* 2d 323 (Sup. Ct. 1955), aff'd, 3 *A. D.* 2d 712, 159 *N. Y. S.* 2d 943 (App. Div. 1955), *J. L. Hennessy Assocs. v. Griffin,* 155 *N. Y. S.* 2d 378 (Sup. Ct. 1956), and *Druid Hills v. Broadway Baptist Church,* 316 *S. W.* 2d 698 (Ky. 1958), *cert.* denied, *Thomas v. Broadway Baptist Church,* 359 *U. S.* 910, 79 *S. Ct.* 590, 3 *L. Ed.* 2d 576 (1959), where the opposite result was reached. But *cf. Plunkett v. Weddington,* 318 *S. W.* 2d 885, 888 (Ky. 1958).

Analysis of the cases indicates that there is scarcely a hard and fast rule, but rather that the result in each case is reached upon a consideration of the particular circumstances involved, including among other things intention, the physical situation, the manner of its creation and the nature of the right asserted. Such is the rationale of the decision in *Good Deal,* where an owner so situated was held not to have access to a street dead-ending at his sideline, which also was the municipal boundary line.

Similarly approaching the instant situation, it is, in the first place, readily apparent that there never was any intention that plaintiffs were to have the use of the dead-end of Camelot Court for access to the rear of their property or for any other purpose. In fact, quite the opposite is the case since the street was ultimately to be continued

through plaintiffs' property. In addition, the effect of allowing plaintiffs to do so would be to give them access at the expense of the developer to the west who had constructed the street to plaintiffs' sideline at his sole cost as required by the subdivision ordinance.[7] This quite properly bothered the thoughtful trial judge, 102 *N. J. Super.*, at 510, and may well have been the factor which caused him to decide as he did. At the time the adjacent development was approved, there was no attempt to charge plaintiffs with a share of the cost, assuming such would be allowable. And now there is neither statutory authority, mechanics nor standards pursuant to which they can be compelled to make such a contribution. *Cf. Longridge Builders, Inc. v. Planning Board of Princeton Township, supra.* (52 *N. J.* 348). It would indeed be inequitable to permit plaintiffs to gain a completely "free ride" by affording them access through the dead-end of the street in such circumstances. (This, of course, is not a case of two adjacent developments, each with its own interior streets constructed by the developers, but connecting with each other.) We therefore hold that plaintiffs have no right whatever to use the dead-end of Camelot Court.

Thus we come back to the matter of the extension of Camelot Court being made necessary by reason of the proposed subdivision. Since the subdivided lots would have no access without it, it becomes apparent that the extension is required because of the subdivision and that if plaintiffs wish to subdivide with access from that direction, they must not only reserve the route of the street extension through their property, but improve and pave it as well and arrange the subdivision in full recognition thereof. Since there is no right to a subdivision where there is no proper street access and plaintiffs, up to this time at least, have not been willing

---

[7] Although this developer objected to approval of plaintiffs' subdivision before the Planning Board and governing body, the record does not indicate whether he pinpointed his objection on this ground.

even to reserve the street extension right-of-way, the subdivision application should have been denied, rather than approved on condition that the proposed street right-of-way merely be reserved.[8]

The judgment of the Appellate Division is modified accordingly, but without prejudice to a new subdivision application or other proceedings by plaintiffs consistent with this opinion. No costs to any party in any court.

HANEMAN, J. (dissenting) I am in accord with my colleagues that "defendants may not condition subdivision approval upon a reservation of the right-of-way through the property for the proposed street extension * * *."

---

[8] One possible alternative occurs to us. While *N. J. S. A.* 40:55–1.39 provides that no building permit shall issue unless the building lot abuts a suitably improved street (see footnote (2), *supra*), *N. J. S. A.* 40:55–1.40 states in substance that where this requirement will entail unnecessary hardship or where the circumstances do not require the structure to be related to a street, a permit applicant may appeal from the denial of permit to the board of adjustment, which is empowered to "make reasonable exceptions and issue a permit subject to conditions that will assume adequate access for fire-fighting equipment, ambulances or other emergency vehicles necessary for the protection of health and safety and that will protect any future street layout shown on the official map or on a master plan of streets duly adopted by a planning board." The section goes on to say that "where such master plan of streets exists, the board of adjustment * * * shall refer the application to the planning board for report and recommendation before taking action."

Pursuant to this section, plaintiffs might seek approval of access to the rear of their property for building purposes by means of a suitably improved private driveway running from the highway north to the rear part of the property. If such an application were granted by the board of adjustment, subdivision approval of the rear part on that basis would have to be allowed by the local agencies. While such would involve "protection" of the route of the proposed future street extension in the sense that it could not be built upon, dedication or construction of that route now could not be required. Future right-of-way acquisition and street construction would have to be undertaken either at full public expense or as a local improvement, the cost of which could be assessed against lands benefited thereby. See *N. J. S. A.* 40:56–1 *et seq.*

I disagree with the balance of the conclusion that under the particular circumstances here involved, plaintiffs "have no right whatever to use the dead end of Camelot Court." I have no doubt that in view of the factual setting, *i. e.,* the approval of the construction of the Camelot Court *cul-de-sac* and the delineation on the master plan of an extension of Camelot Court across plaintiffs' lands, that the Borough has the right to bar plaintiffs from any use of the dead end because such use might interfere with the future actual construction of said extension, or because if the proposed extension is constructed, it might destroy the plaintiffs' abutment on Camelot Court as presently proposed. However, this right is not absolute and unlimited in time. The right exists only for a reasonable time to accord the municipality the opportunity to obtain an easement or title, either by voluntary act of plaintiffs or by condemnation.

Here, the municipality is in effect seeking to force the landowner to dedicate a street across his property without any compensation for the taking of said land, a result which the Borough is admittedly capable of accomplishing only by the fortuitous circumstance that plaintiffs desire to subdivide their plot.

Under the express language of the majority, plaintiffs are prevented not only from using Camelot Court for access to newly created lots under the proposed subdivision, but also from any use for access to their lot in its existing conformation. It is no answer to say that plaintiffs would not in any event have had the adjacent dead-end frontage except for its construction by the adjoining owner at the latter's own expense. The fact remains that Camelot Court *is* a dedicated public street and plaintiffs are entitled to access to the same extent as other abutting owners who bore no portion of the cost. Access is being denied plaintiffs to force them to gratuitously dedicate part of their land for a public way. The municipality should not be permitted to coerce plaintiffs into acceding to an unconstitutional taking of private lands without consideration. I would, there-

fore, deny plaintiffs' application for a reasonable period of time sufficient to permit the municipality to purchase the proposed right-of-way. In the event of its inability to reach an agreement with plaintiffs as to price, I would deny the application for such further period of time as may be required to expeditiously complete condemnation proceedings for such acquisition. In the event that the Borough has not so obtained title by either method within a reasonable time, I would grant the subdivision approval. Further, I agree that if the acquisition of title or an easement for the extension is accomplished, plaintiffs must "improve and pave [the extension] * * * and arrange the subdivision in full recognition thereof," as stated in the majority opinion, if they desire to subdivide with frontage on such extension.

*For modification*—Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL and SCHETTINO—6.

*Dissenting in part*—Justice HANEMAN—1.