NEW JERSEY BUILDERS ASSOCIATION, A CORPORATION NOT FOR PROFIT OF THE STATE OF NEW JERSEY, BUILDERS ASSOCIATION OF SOMERSET AND MORRIS, A CORPORATION NOT FOR PROFIT OF THE STATE OF NEW JERSEY, AND MILL RACE LIMITED, A PARTNERSHIP, PLAINTIFFS-RESPONDENTS, v. THE MAYOR AND TOWNSHIP COMMITTEE OF BERNARDS TOWNSHIP, SOMERSET COUNTY, DEFENDANT-APPELLANT.

Argued February 2, 1987—Decided July 8, 1987.

*Howard P. Shaw* argued the cause for appellant (*Schenck, Price, Smith & King*, attorneys).

*Stewart M. Hutt* argued the cause for respondents New Jersey Builders Association, etc., and Builders Association of Somerset and Morris, etc. (*Hutt, Berkow & Jankowski*, attorneys).

*Roy E. Kurnos* argued the cause for respondent Mill Race Limited, etc. (*Murphy, Kurnos & Nish*, attorneys).

The opinion of the Court was delivered by

STEIN, J.

The narrow issue that we address in this appeal is whether Bernards Township's Ordinance 672 is a valid exercise of the authority conferred upon municipalities by the Municipal Land Use Law (MLUL), specifically *N.J.S.A.* 40:55D–42. We hold that that portion of the ordinance that requires new developers to pay their pro-rata share of the Township's long term, twenty-million dollar road improvement plan exceeds the Township's authority under the MLUL and is therefore invalid. Accordingly, we affirm the judgment of the Appellate Division.

I

The material provisions of Ordinance 672 are set forth at length in Judge D'Annunzio's well-reasoned opinion below, *New Jersey Builders Ass'n v. Bernards Township*, 211 *N.J.Super.* 290 (Law Div.1985). We reiterate them only to the extent necessary to permit a full understanding of the ordinance's purpose and intended implementation.

Bernards Township, bisected by Interstate Highways 78 and 287, is a rapidly-developing municipality in northern Somerset County. During the late 1970's, and in response to the impact of new and increased development, the Township authorized a consulting firm to undertake a comprehensive transportation and traffic study of the entire Township. The study summa-

rized the existing traffic conditions in the community, made traffic projections based on current and projected development in accordance with the zoning ordinance, and set forth road improvements deemed necessary to accommodate current and anticipated development throughout the Township. The result of the study was a Transportation Management Plan that was substantially incorporated into the circulation element of the Township's Master Plan. *See N.J.S.A.* 40:55D–28b(4). Reflecting the consultant's recommendations, the Master Plan proposed an extensive roadway improvement program involving improvements to twenty-two township roads, seventeen intersections, seven county roads, two county bridges, and off-street commuter parking facilities. It was anticipated that the improvements would be constructed over a twenty-year period at an estimated cost of twenty million dollars.

As recommended by the Master Plan, Ordinance 672 was adopted to provide a mechanism for allocating the cost of the road improvement program between the Township and its residential and commercial developers. The premise underlying Ordinance 672 is that all new development within the Township contributes to the need for Township-wide road improvements. Thus, allocating the cost of such roadway improvements, on the basis of "trip generation" forecasts, between the Township—to reflect the impact of existing development—and new developers was a reasonable and appropriate exercise of the Township's regulatory authority under the MLUL.

Judge D'Annunzio carefully summarized the cost-allocation formula set forth in Ordinance 672:

Utilizing the *Trip Generation Handbook* published by the Institute of Transportation Engineers the appendix to the ordinance establishes trip generation rates for six basic uses: single family, multi-family, senior citizen, general office, professional office and retail. For example, a single-family residence will generate 1.1 p.m. peak hour trips. Specifically it will generate 0.7 arrivals and 0.4 departures. Similarly, a general office will generate 1.63 p.m. peak-hour trips per 1,000 square feet. A development of 100 single-family residences will generate 110 p.m. peak hour trips. The township determined that at full development 23,700 p.m. peak-hour trips per day will be generated. It was further determined that development in place in 1982 generated 7,450 p.m.

peak-hour weekday trips. Utilizing simple mathematics the township determined that the share of the cost of the roadway improvement program to be borne by general township revenues is 31.4%

$$\left(\frac{7,450}{23,700}\right)$$

and the share to be borne by future developers is 68.6%. The estimated cost for the improvement of *municipal* roads is $14,800,000. The general revenue share, *i.e.*, the share allocated to existing development is 31.4% or $4,547,000. The balance of $9,933,000 is allocated to new development as is the entire projected cost of improvements to county roads which are to be made by the township in the amount of $5,520,000. Therefore, the total cost to be borne by future development is $15,453,000. Dividing that amount by the 16,250,000 [sic] p.m. peak hour trips to be generated by all future development yields an assessment of $951 per trip generated by all new development. The developer of 100 single-family homes resulting in 110 trips must pay Bernards Township $104,610 as his share of the cost of the transportation network improvement program. This assessment would be in addition to the cost of off-tract improvements necessitated or required by the new development where no other property owners receive a special benefit. In a non-residential context the builder of four retail stores of 1,000 square feet each would pay an assessment of $54,770.60 because each 1,000 square feet of retail space generates 14.40 p.m. peak-hour trips. [211 *N.J.Super.* at 292–93.]

The ordinance requires developers to pay 50% of their share of the road improvement cost upon issuance of a building permit, to post security for the unpaid balance, and to pay the balance upon issuance of a certificate of occupancy. The ordinance permits payment on the basis of construction in stages, or payment on a per-unit basis at an accelerated rate.[1] Money paid to the Township pursuant to Ordinance 672 is to be segregated, until spent, in a separate dedicated account. The ordinance permits a developer, or its successor in title, to apply for a refund if the funds paid are not spent by the Township within twenty years, or ten years after execution of the particular Developer's Agreement, whichever is later. If no refund claim is made within one year after the date on which it may first be asserted, the money reverts to the Township for general capital purposes.

---

[1] If the unit method is selected, payment for each unit shall be twice the per-unit allocation until the applicant's pro-rata share is satisfied in full.

Plaintiffs New Jersey Builders Association and its local affiliate, Builders Association of Somerset and Morris, are trade organizations consisting of builders and developers, some of whom allegedly own property in Bernards Township that they intend to develop. Plaintiff Mill Race Limited is a purchaser of land in the Township that has since been developed.[2] Although the Township challenges plaintiffs' standing to seek a declaratory judgment that Ordinance 672 is invalid, we are fully in accord with the Appellate Division's conclusion that "plaintiffs have demonstrated a sufficient stake and adverse interest as to entitle them to sue under New Jersey's liberal rules of standing." 219 *N.J.Super.* 539 (App.Div.1986) (citing *Crescent Park Ass'n v. Realty Equities Corp. of N.Y.*, 58 *N.J.* 98, 105–111 (1981)).

The Law Division held that the road improvement provisions of Ordinance 672 violated the limited grant of authority, set forth in *N.J.S.A.* 40:55D–42,[3] permitting municipalities to re-

---

[2]According to the Township's Appellate Division brief, Mill Race Limited has instituted a separate suit seeking a refund of money allegedly paid pursuant to Ordinance 672.

[3]*N.J.S.A.* 40:55D–42 provides:

The governing body may by ordinance adopt regulations requiring a developer, as a condition for approval of a subdivision or site plan, to pay his pro-rata share of the cost of providing only reasonable and necessary street improvement and water, sewerage and drainage facilities, and easements therefor, located outside the property limits of the subdivision or development but necessitated or required by construction or improvements within such subdivision or development. Such regulations shall be based on circulation and comprehensive utility service plans pursuant to subsections 19b.(4) and 19b.(5) of this act, respectively, and shall establish fair and reasonable standards to determine the proportionate or pro-rata amount of the cost of such facilities that shall be borne by each developer or owner within a related and common area, which standards shall not be altered subsequent to preliminary approval. Where a developer pays the amount determined as his pro-rata share under protest he shall institute legal action within 1 year of such payment in order to preserve the right to a judicial determination as to the fairness and reasonableness of such amount. [Footnote omitted.]

quire developers to pay their share of "reasonable and necessary" off-site improvements. 211 *N.J.Super.* at 297. The Law Division did not determine the validity of the ordinance's provisions relating to off-tract drainage improvements. The court also declined to rule on the Township's motion that the decision invalidating the ordinance should apply prospectively only. The Appellate Division, affirming on the basis of the opinion below, specifically ruled that the judgment would not be limited to prospective application. 219 *N.J.Super.* at 539. We granted the Township's petition for certification. 104 *N.J.* 421 (1986).

## II

Although our disposition of this appeal is controlled by what we discern to be the intended scope of *N.J.S.A.* 40:55D–42, a broader context is indispensable to a full understanding of the implications of the issue before us. We acknowledge that our experience with municipal attempts to charge developers for off-site improvements has heretofore been limited to the cost of facilities closely related to needs generated by the specific development. *See, e.g., Divan Builders v. Township of Wayne,* 66 *N.J.* 582 (1975) (municipality sought contribution toward improvement of drainage basin serving subdivision and adjacent area); ordinances adopted by state *Longridge Builders v. Planning Bd. of Princeton Township.,* 52 *N.J.* 348 (1968) (municipality required developer to pave dedicated right-of-way from subdivision boundary to public street); *cf. Daniels v. Point Pleasant,* 23 *N.J.* 357 (1957) (municipality enacted invalid ordinance amendment increasing building permit fees for the purpose of raising revenue to meet increased school costs). In other states, local governments have attempted to impose a variety of indirect capital costs on new developers, a trend that appears to have gained momentum during the past decade. Bauman & Ethier, "Development Exactions and Impact Fees: A Survey of American Practices," *Law & Contemp. Probs.,* Winter 1987, at 51. *See generally* Exactions: A Controversial New Source for Municipal Funds, Symposium, *Law & Con-*

*temp. Probs.*, Winter 1987 (discussing economic and legal factors affecting the use and validity of governmentally-imposed exactions); Heyman & Gilhool, "The Constitutionality of Imposing Increased Community Costs on New Suburban Residents Through Subdivision Exactions," 73 *Yale L.J.* 1119 (1964) (urging a "reasonableness" standard to evaluate the validity of subdivision exaction ordinances).

There is wide variation in the types of exactions that governmental entities impose on developers. The most common are those that require dedication of land within the subdivision for public purposes and the construction of improvements such as streets, sidewalks, and water and sewer lines. Connors & High, "The Expanding Circle of Exactions: From Dedication to Linkage," *Law & Contemp. Probs.*, Winter 1987, at 70. Another common type of exaction requires developers to construct off-site improvements, usually on property adjacent to the subdivision for road or drainage purposes. Smith, "From Subdivision Improvement Requirements to Community Benefit Assessments and Linkage Payments: A Brief History of Land Development Exactions," *Law & Contemp. Probs.*, Winter 1987, at 5, 7–8.

Less common but frequently sustained are requirements for dedication of land for recreational purposes, or payments in lieu of dedication, where the purpose of the dedication or payment is primarily, but not exclusively, to benefit the residents of the new development. Connors & High, *supra* at 71; *see also City of College Station v. Turtle Rock Corp.*, 680 *S.W.*2d 802 (Tex.1984) (upholding ordinance requiring dedication of one acre of land for each 133 housing units, or payment of fee in lieu of dedication, to be used for neighborhood park purposes); *Aunt Hack Ridge Estates v. Planning Comm'n*, 160 *Conn.* 109, 273 *A.*2d 880 (1970) (sustaining ordinance requiring dedication of area equal to 4% of subdivision, but not less than 10,000 square feet, for recreational use); *Jenad, Inc. v. Village of Scarsdale*, 18 *N.Y.*2d 78, 218 *N.E.*2d 673, 271 *N.Y.S.*2d 955 (1966) (upholding ordinance requiring dedication of land, or payment of fee of

$250 per lot, for park purposes); *Jordan v. Village of Menomonee Falls*, 28 *Wis.*2d 608, 137 *N.W.*2d 442 (1965) (upholding ordinance requiring payment of $200 per lot, or dedication of land of equal value, for school, park, and recreational purposes). *But cf. Pioneer Trust v. Village of Mt. Prospect,* 22 *Ill.*2d 375, 176 *N.E.*2d 799 (1961) (invalidating municipal ordinance requiring dedication of one acre per sixty housing units for public use).

Another type of municipal exaction, typified by the Bernards ordinance and by ordinances challenged in a series of Florida cases, is the impact fee, described generally as a "charge[ ] against new development for the purpose of raising money to defray the costs of basic services local government provides to its citizens." Currier, "Legal and Practical Problems Associated with Drafting Impact Fee Ordinances," 1984 *Institute on Planning, Zoning and Eminent Domain* at 273–74. Impact fees are described as a cost-shifting device that contributes to "the efforts of local governments to cope with the economic burdens of population growth such as the need for new roads, schools, parks, and sewer and water treatment facilities." Juergensmeyer & Blake, "Impact Fees: An Answer to Local Governments' Capital Funding Dilemma," 9 *Fla.St.U.L.Rev.* 415, 417 (1981). They are justified on the theory that "it is possible to allocate to each development its proportionate share of the future cost of providing public services * * *." Smith, *supra* at 16.

In *Contractors & Builders Ass'n v. City of Dunedin*, 329 *So.*2d 314, 318 (1976), the Florida Supreme Court concluded that a city had the authority under Florida's constitution and statutory law to impose an impact fee to defray the capital cost of improving the city's water and sewerage system to meet the increased demand created by new development. The Court concluded that such an ordinance is valid "where expansion is

reasonably required, *if use of the money collected is limited to meeting the cost of expansion."* at 320 (emphasis in original).[4]

In *Hollywood Inc. v. Broward County*, 431 *So.*2d 606 (Fla. Dist.Ct.App.), petition for review denied, 440 *So.*2d 352 (1983), the court upheld a county ordinance that required a dedication of land or a fee payment to assist the county in developing its park system. The ordinance required three acres of park land to be dedicated for each 1,000 residents, or payment of either the value of the required dedication or an impact fee prescribed by the ordinance. The funds had to be expended within a reasonable period of time to acquire new park land within fifteen miles of the subdivision. The court held that the ordinance was valid insofar as its requirements "offset needs sufficiently attributable to the subdivision and so long as the funds collected are sufficiently earmarked for the substantial benefit of the subdivision residents." *Id.* at 611.

Two Florida impact-fee cases involved attempts to collect funds for road improvement purposes. In *Broward County v. Janis Dev. Corp.*, 311 *So.*2d 371 (Fla.Dist.Ct.App.1975), a county ordinance imposed a fee of $200 for each housing unit constructed, to be deposited in a trust fund "for the purpose of constructing or improving roads, streets, highways, and bridges * * *." *Id.* at 374. In that case, however, the court found "no specifics provided in the ordinance as to where and when these monies are to be expended." *Id.* at 375. Accordingly, the court refused to uphold the ordinance, concluding that the impact fee imposed by the ordinance was a tax prohibited by the Florida constitution.

The second road-improvement case, *Home Builders & Contractors Ass'n v. Board of County Comm'rs*, 446 *So.*2d 140 (Fla.Dist.Ct.App.1983), petition for review denied, 451 *So.*2d

---

4Although the Florida Supreme Court invalidated the ordinance because of inadequate restriction on the use of the fees collected, *id.* at 321–22, the ordinance was amended and later upheld, *City of Dunedin v. Contractors & Builders Ass'n*, 358 *So.*2d 846 (Fla.Dist.Ct.App.1978), *cert.* denied, 370 *So.*2d 458, *cert.* denied, 444 *U.S.* 867, 100 *S.Ct.* 140, 62 *L.Ed.*2d 91 (1979).

848, appeal dismissed, 469 *U.S.* 976, 105 *S.Ct.* 376, 83 *L.Ed.*2d 311 (1984), involved an ordinance that imposed an impact fee on developers to pay for road construction required by increased traffic generated from new developments. The ordinance relied on a formula that took into account the cost of road construction and the number of motor vehicle trips generated by different types of development. The ordinance divided the county into forty zones, establishing a trust fund for each zone and requiring that funds collected from development could be expended only in the zone in which the development was located. The court concluded that the ordinance imposed a regulatory fee and not a tax, observing that the estimated cost of new road construction would far exceed the fees imposed by the ordinance, that the ordinance permitted developers to demonstrate that their required contribution should be lower than that provided in the ordinance, and that expenditures of funds collected were to be allocated by zones. The court sustained the ordinance, concluding that such an imposition was valid "as long as the fee does not exceed the cost of the improvements required by the new development and the improvements adequately benefit the development which is the source of the fee." *Id.* at 143–44.

. Another novel type of municipal exaction is the fixed benefit assessment, a fund-raising mechanism employed in California to impose the cost of broad categories of public improvements on the owners of undeveloped property. In *J.W. Jones Companies v. City of San Diego*, 157 *Cal.App.*3d 745, 203 *Cal.Rptr.* 580 (Ct.App.1984), the court upheld a fixed benefit assessment of approximately twenty-seven million dollars imposed by San Diego on undeveloped parcels to cover about half the cost of street and park improvements intended to serve the area of the city assessed. In sustaining the ordinance the court concluded that it was "a valid exercise of San Diego's power to require undeveloped land to bear the costs of the public facilities necessary for the health and welfare of the future residents

* * *." *Id.* at 758, 203 *Cal.Rptr.* at 589; *see also* Smith, *supra* · at 19–24 (general discussion of fixed benefits assessments).

Recently, some municipalities, such as San Francisco and Boston, have enacted "linkage" ordinances that condition the right to develop commercial properties on construction of or contribution to the cost of low- and moderate-income housing. *See* Smith, *supra*, 25–28; Connors & High, *supra*, 77–83. *See generally* Kayden & Pollard, "Linkage Ordinances and Traditional Exactions Analysis: The Connection Between Office Development and Housing," *Law & Contemp. Probs.*, Winter 1987, at 127 (asserting that ordinances linking housing needs with office development are sustainable under "reasonable relationship" test used by courts to analyze development exactions).

The variety of governmental devices used to impose public facility costs on new development reflect a policy choice that higher taxes for existing residents are less desirable than higher development costs for builders, and higher acquisition costs for new residents. An obvious concern is that the disproportionate or excessive use of development exactions could discourage new development or inflate housing prices to an extent that excludes large segments of the population from the available market. *See generally* Nicholas, "Impact Exactions: Economic Theory, Practice, and Incidence," *Law & Contemp. Probs.*, Winter 1987 at 85 (arguing for more restricted use of developer exactions). The complex legal and policy issues affecting both the decision to authorize impact-fee-type ordinances, and if authorized, their sustainable limits, are not before us in this case. We are convinced that when the Legislature enacted the MLUL, it did not authorize the exaction imposed on developers by Bernards Township's Ordinance 672.

### III

Most, but not all, of the cases considering the validity of impact fees or other municipal exactions do so in the context of the underlying statutes that set forth the powers of local

governments in reviewing subdivision and development applications. *See* Johnston, "Constitutionality of Subdivision Control Exactions: The Quest for a Rationale," 52 *Cornell L.Q.* 871, 887 (1967); *see also* 4 Anderson, *American Law of Zoning,* § 23.40 at 145 (2d ed. 1977) ("The most common rationale of the decisions which disapprove the exaction of money in lieu of land for parks is that the enabling acts do not authorize the requirement.")

Our evaluation of the validity of Bernards Township's Ordinance 672 depends on whether the power to enact it is expressly conferred by, or may fairly be inferred from, the relevant provisions of the MLUL. It is fundamental that laws concerning municipal corporations are to be "liberally construed in their favor," *N.J. Const.* of 1947 art. IV, sec. 7, para. 11, and the MLUL expressly requires that its provisions be broadly construed. *N.J.S.A.* 40:55D–92. Nevertheless, in determining the legislative intent, we are constrained by the plain language of *N.J.S.A.* 40:55D–42 and are informed by decisional law concerning municipal subdivision regulation that preceded the statute's enactment.

The predecessor to *N.J.S.A.* 40:55D–42 was *N.J.S.A.* 40:55–1.-21 (repealed), a section of the Municipal Planning Act of 1953 that authorized municipalities to require construction of on-site improvements in connection with subdivision approval, but contained no reference to off-site improvements. *See Divan Builders v. Township of Wayne, supra,* 66 *N.J.* at 595. Prior to the *Divan* decision, municipal authority to compel installation of or payment for off-site improvements had not been established.

Curiously, the issue does not appear to have been raised directly in New Jersey prior to *Longridge Builders, Inc. v. Planning Bd. of Princetown Township, supra,* 52 *N.J.* 348. There, the local planning board imposed as a condition of subdivision approval the requirement that the developer pave a dedicated but unimproved off-site right-of-way a distance of 361

feet from the northern boundary of the subdivision to an existing public road. Both the trial court, 92 *N.J.Super.* 402 (Law Div.1966), and the Appellate Division, 98 *N.J.Super.* 67 (1967), held that the Municipal Planning Act of 1953 did not empower a municipality to require off-site improvements as a condition of subdivision approval. This court affirmed without deciding the issue of statutory interpretation, concluding that the absence of standards in the ordinance for determining the allocation of costs among adjacent properties rendered the ordinance and the condition invalid. *Longridge Builders, supra,* 52 *N.J.* at 350–52.

In 1970 this Court decided *Brazer v. Borough of Mountainside,* 55 *N.J.* 456, where a municipality required as a condition of subdivision approval, on-site dedication of land for street purposes. In *Brazer,* the Court, construing *N.J.S.A.* 40:55–1.-21, emphasized the fundamental principle that a "subdivider may be compelled only to assume a cost 'which bears a rational nexus to the needs created by, and benefits conferred upon, the subdivision * * *.' " 55 *N.J.* at 466 (quoting *Longridge Builders, supra,* 52 *N.J.* at 350).

It was not until *Divan Builders v. Township of Wayne, supra,* that the issue of a municipality's power to require off-site improvements was definitively resolved. There the developer's building site was substantially covered by a pond, and the preliminary subdivision plan contemplated draining the pond and "construct[ing] a conduit to pipe the water from its upstream source through the development and into an existing drainage facility on the downstream border of the site." 66 *N.J.* at 587. Subsequent to the grant of preliminary subdivision approval, the governing body amended the subdivision ordinance to establish procedures authorizing the construction of off-site improvements as a condition of subdivision approval. The planning board's recommendation for final approval of the subdivision included the condition that the applicant contribute to the township the sum of $20,000 as its "share of improving the downstream conditions of the stream which carries the

drainage from the subdivision." *Id.* at 589. One other developer was also required to contribute to the cost of the drainage improvement.

The primary issue in *Divan* was the authority of the planning board, pursuant to the Municipal Planning Act of 1953, to require the developer to contribute to the cost of an off-site improvement. Acknowledging that the statute was silent with regard to off-site improvements, the Court concluded that recognition of a municipality's authority to require construction of or contribution to the cost of off-site improvements "comports with the overall legislative purpose to require developers in the first instance to assume the legitimate expenses of subdivision." *Id.* at 597. The Court observed that

> the constitutional and legislative direction to resolve questions of municipal authority broadly in favor of the local unit, compels the conclusion that, by necessary implication, *N.J.S.A.* 40:55–1.21 empowers a planning agency to require both on-site and off-site improvements of the physical character and type referred to in *N.J.S.A.* 40:55–1.20 and *N.J.S.A.* 40:55–1.21, *including off-site improvements made necessary by reason of the subdivision's effect on lands other than the subdivision property,* provided that the agency acts pursuant to a valid local ordinance containing suitable standards governing construction and installation of improvements. [*Id.* at 596 (emphasis added).]

It is against this rather sparse backdrop of New Jersey case law considering municipal power to require off-site improvements that we assess the Legislature's intent in adopting *N.J.S.A.* 40:55D–42. We note counsels' concurrence that although the MLUL became effective in August 1976, more than a year after the decision in *Divan,* the drafting of the MLUL was substantially completed before the opinion in *Divan* was published. Nevertheless, when the Legislature enacted the MLUL in 1976, it is presumed to have had knowledge of the relevant judicial decisions. *See Barringer v. Miele,* 6 *N.J.* 139, 144 (1951). Had its intent been to expand significantly municipal power to require contribution for off-site improvements, we are confident that this intention would have been manifested in the legislative history of the MLUL. In its absence, we construe *N.J.S.A.* 40:55D–42 in a manner consistent with the

rationale expressed in our decisions in *Divan* and *Longridge Builders.*

Thus, the critical language of the statute permits a municipality to require a developer "to pay his pro rata share of the cost of providing only *reasonable and necessary street improvements* and water, sewerage and drainage facilities, and easements therefor, located outside the property limits of the subdivision or development *but necessitated or required by construction or improvements within such subdivision or development.* N.J.S.A. 40:55D–42 (emphasis added). We conclude that the plain meaning and obvious legislative intent was to limit municipal authority only to improvements the need for which arose as a direct consequence of the particular subdivision or development under review. The phrase "necessitated or required by construction .* * * within such subdivision or development" precludes the more expansive statutory interpretation urged upon us by counsel for Bernards Township.[5] ·

It is indisputable that subdivisions and development applications, in addition to their direct impact on municipal facilities in the surrounding area, have a cumulative and wide-ranging impact on the entire community. We cannot fault the logic or the foresight that induces a municipality such as Bernards Township to consider the long-term impact of permitted development on municipal resources and public facilities. But as yet

---

[5]We add one important qualification. By our decision we do not purport to determine the limits of specific applications of *N.J.S.A.* 40:55D–42, nor do we exclude its possible application to a street, water, sewerage, or drainage facility affecting all or substantially all of a municipality if the direct causal relationship between the development and the need for the improvement is demonstrated.

the Legislature has not delegated to municipalities the far-reaching power to depart from traditionally authorized methods of financing public facilities so as to allocate the cost of substantial public projects among new developments on the basis of their anticipated impact.

For the reasons stated, we hold that Ordinance 642 is an invalid exercise of municipal authority. We are in accord with the Appellate Division's conclusion that the invalidation of the ordinance should not be limited to prospective application only. 219 *N.J.Super.* at 539.

The judgment of the Appellate Division is affirmed.

*For affirmance*—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, GARIBALDI and STEIN—5.

*For reversal*—None.