991 A.2d 290 (2010)
412 N.J. Super. 443
In the Matter of Protest of Award of NEW JERSEY STATE CONTRACT A71188 for Light Duty Automotive Parts.
Superior Court of New Jersey, Appellate Division.
Argued October 21, 2009.
Decided April 14, 2010.
*291 Maeve E. Cannon, Princeton, argued the cause for appellants New Jersey Coalition of Automotive Retailers, Beyer Brothers Corp., PNCFLM, L.L.C., and Bob Novick Chevrolet (Hill Wallack L.L.P., attorneys; Patrick D. Kennedy and Ms. Cannon, of counsel and on the brief; Megan McGeehin Schwartz, on the brief).
K & L Gates, L.L.P., and Robert Bergen of the Washington, D.C. and New York bars, admitted pro hac vice, for respondent AutoZone, Inc. (Mr. Bergen, of counsel; Elizabeth M. Harris, on the brief).
Cynthia Hackett, Deputy Attorney General, argued the cause for respondent Department of the Treasury, Division of Purchase and Property (Anne Milgram, Attorney General, attorney; Melissa H. Raksa, Assistant Attorney General, of counsel; Ms. Hackett, on the brief).
Before Judges CUFF, PAYNE, C.L. MINIMAN.
The opinion of the court was delivered by
CUFF, P.J.A.D.
In this appeal we review a challenge to an award of a contract by the Acting Director (the Director) of the Division of Purchase and Property (DPP) for auto parts and accessories to respondent AutoZone, Inc. Appellants are three vendors of automotive parts who held the previous State contracts for these items and their industry association. Their challenge presents several issues of first impression because the Director awarded the contract pursuant to N.J.S.A. 52:34-6.2, which permits the Director to enter into cooperative purchasing agreements with one or more states or political subdivisions of those states for the purchase of goods and services.
Appellants do not argue that the Director lacked the authority to enter a cooperative purchasing agreement awarded by another state or political subdivision. They do argue that the Director deviated from the terms of the statute authorizing such cooperative purchasing agreements by negotiating a separate contract with AutoZone that does not adhere to the terms of the AutoZone agreement it purportedly adopts; failed to properly review the out-of-state bidding process, and the specifications, terms and conditions of the cooperative bidding agreement; and entered into a contract with unclear pricing standards. AutoZone and the Director argue that the Director's actions were proper and that appellants lack standing to challenge the award.
We hold that appellants have standing and that the Director negotiated a contract within the terms of the competitively bid and awarded contract by the out-of-state public entity. The absence of specific findings of fact and the scant record, however, do not allow us to determine whether the out-of-state contract adopted by the Director is the most cost-effective means of procurement of auto parts and accessories. We, therefore, remand for further proceedings consistent with this opinion.

I
In 1996, the Legislature authorized the Director to enter into cooperative purchasing agreements, N.J.S.A. 52:34-6.2. These agreements allow participating states or political subdivisions to standardize and combine their requirements for certain goods and services to the end of obtaining *292 a more advantageous price or quality of service or both. N.J.S.A. 52:34-6.2a. The Director may elect to purchase goods or services through a cooperative purchasing agreement "whenever the director determines this to be the most cost-effective method of procurement." N.J.S.A. 52:34-6.2b(1). Therefore, the Director must "review and approve the specifications and proposed terms and conditions of the contract" prior to entering any contract awarded through a cooperative purchasing agreement. Ibid. The Director is also authorized to solicit bids and to award a contract for goods and services that other states or political subdivisions may join as parties to a cooperative purchasing agreement. N.J.S.A. 52:34-6.2c.
In 2005, the Legislature authorized the Director to purchase goods and services through a contract already awarded by other states or cooperative purchasing groups that utilize a competitive bidding process. N.J.S.A. 52:34-6.2b(2). Here, too, the Director must review and approve the specifications and the proposed terms of the contract prior to entry of any contract awarded in this fashion. Ibid. When the decision is made to enter a cooperative purchasing agreement, the Director is not required to comply with the law of this State governing the award of public contracts other than the requirement to purchase all articles or supplies manufactured or produced by institutional labor.[1]
Although the concept of state cooperation in obtaining goods and services is not new and has been utilized for many years, there has a been a recent surge in cooperative purchasing contracts at the federal and state levels. National Association of State Procurement Officials (NASPO), Strength in Numbers, An Introduction to Cooperative Procurements 2 (February 2006), available at http://www.naspo.org/ documents/cooperativepurchasingbrief.pdf. There are three types of cooperative purchasing: true cooperatives, "piggyback" options, and third party aggregators. Id. at 3. In using a piggyback option agreement, "one or more organizations represent their requirements and include an option for other organizations to `ride' or `bridge' the contract as awarded." Ibid.
The federal government formally began an attempt to implement and regulate the cooperative procurement process at the international level in 1979. World Trade Org., General Overview of WTO Work on Government Procurement, http://www.wto. org/english/traptop_e/gproc_e/overview_e. htm (last visited Mar. 29, 2010). In 1994, it expanded the cooperative procurement process to cover goods as well as services and to cover subnational as well as central government authorities. Ibid.
States began to attempt to streamline their national procurement processes at about the same time as the federal government. Many states, including New Jersey, adopted legislation to authorize and regulate national procurement and cooperative purchasing agreements. N.J.S.A. 52:34-6.2b(1) and (2), in particular, are piggyback methods of cooperative purchasing. The Legislature anticipated that "cooperative purchasing agreements would enable New Jersey to benefit from procurements which are more cost effective because of volume purchasing, standardized specifications, and increased leverage in the marketplace." Assembly Appropriations Committee, Statement to A. 182 (Feb. 15, 1996). The stated purpose of the 2005 amendment was "to increase the state's range of purchasing options and enable the state to realize cost savings by eliminating the need for a separate bidding process for *293 goods and services that have already been competitively bid by other states with similar interests and fiscal restraints." Senate State Government Committee, Statement to S. 2194 (Jan. 31, 2005). See also Sponsor's Statement to S. 2194 (Dec. 13, 2004).
In March 2006, the city of Charlotte, North Carolina, issued a request for proposals (RFP) on behalf of the U.S. Communities Government Purchasing Alliance (U.S. Communities) and other yet-to-be-named participating public entities for a five-year "Master Purchasing Agreement" supplying automotive parts and accessories for light duty vehicles. U.S. Communities is a non-profit sourcing association that offers, coordinates and administers competitively solicited master purchasing agreements through lead public entities to other participating public entities nationwide. Other participating public entities include states, counties, cities, school boards, and non-profit organizations.
To take part in this purchasing format, national suppliers and public entities, both the lead and participating public entities, register with U.S. Communities. Lead public entities, like Charlotte, conduct a competitive bidding and selection process and then sign a master purchasing agreement with the winning supplier. That supplier can then offer the master purchasing agreement as its "primary contract" to other government agencies nationwide, while agreeing to comply with the state and local laws in each locality where its product is provided.
A participating public entity signs a "Master Intergovernmental Cooperative Purchasing Agreement" (MICPA) with the lead public agency in order to piggyback on its master purchasing agreement. According to each MICPA, the participating public entity agrees not to negotiate new or better terms or conditions, such as price, than those negotiated by the lead public agency, "except as modification of those terms and conditions is otherwise allowed or required by applicable law" of the purchasing state. A MICPA also states that "[t]he procuring party shall not use this agreement as a method for obtaining additional concessions or reduced prices for similar products or services."
The stated intention of the Charlotte RFP was to achieve, among other things, "cost savings for [s]uppliers and participating public agencies through a single competitive solicitation" and to "[c]ombine the volumes of participating public agencies to achieve cost effective pricing." Consequently, it stated that bidders had to give due consideration to the potential national market, and provide product offerings "TO ENSURE THE BEST POSSIBLE SOLUTION FOR ALL PARTICIPATING AGENCIES." Only suppliers who met identified minimum qualifications could submit a proposal. Those qualifications were:
A. A strong national presence easily recognized by government agencies nationwide;
B. A national sales force easily accessible by government agencies nationwide;
C. A national distribution network having capacity to deliver Products nationwide, free of charge, in a timely manner;
D. A full range of Products to meet varying requirements of government agencies;
E. Demonstrated market with bulk purchasing power, capacity and commitment to guarantee lowest government pricing.
F. Existing capacity to provide toll-free telephone and state of the art electronic, facsimile and internet ordering and billing;

*294 G. A support system to provide assistance to government agencies nationwide[; and]
H. The ability to fully implement all necessary activities to effectively promote the program nationally. . . .
The RFP also clearly stated that any subsequent contracts with participating entities would be governed by and construed in accordance with the laws of the participating state.
The RFP was (1) sent to four national auto parts suppliers, including respondent AutoZone, (2) posted on U.S. Communities' website and on several public entity procurement websites, and (3) advertised in the local Charlotte newspaper. Only two suppliers, including AutoZone, submitted proposals. AutoZone is a Nevada corporation with a separate wholly-owned subsidiary in New Jersey with over sixty outlets or stores. It has "stores in 48 states and Puerto Rico," including "many stores in New Jersey."
In June 2006, Charlotte awarded the contract to AutoZone and entered into Master Purchase Agreement Contract No. 0601343 (Master Agreement), setting forth the basic terms of the contract. As to "CONTRACT PRICING," the Master Agreement stated:
5.1 The City agrees to pay [AutoZone] for materials, supplies, equipment, apparatus and services delivered in accordance with the terms and conditions of this Agreement based on a fixed percentage discount from the current Company Lowest Zone Price list as identified and incorporated into this Agreement as Exhibit A.
5.2 [AutoZone] agrees the fixed percentage discount will remain firm for entire contract term.
. . . .
5.5 [AutoZone] shall be responsible for furnishing and delivering approved price lists . . . to the City and other participating public entities upon request.
5.6 [AutoZone] agrees that during the term of the Agreement, no State or Local public agency with the same payment terms, volume, delivery terms and other conditions set forth in the Master Agreement will receive the products provided under this Agreement at a lower net price. [AutoZone] will provide U.S. Communities and the Participating Public Agencies with such lower pricing on a going forward basis. . . .
According to Exhibit A, entitled "PRICING FORM," discount percentages range between five and twenty percent for each of the listed products. There were, however, no specific prices listed on Exhibit A. At the end of document, it stated:
[AutoZone]'s pricing is determined by the competition in any given market. Where [AutoZone] is positioned in a market where there are multiple competitors[,] the pricing will be less expensive to the consumer. [AutoZone] has developed multiple pricing "Zones" as a result of this process.
Pricing is based on the Lowest Zone less tiered percentage discount based upon total combined U.S. Communities Program net sales as follows.
 5% 
 10% $3MM-$10MM
 15% $10MM-$20MM
 20% > $20MM
Sometime before the expiration of the current contract for auto parts, DPP gave AutoZone the opportunity to present its proposal to supply auto parts to this State under a cooperative purchasing agreement piggybacking on the Charlotte Master Agreement. AutoZone proposed: (1) extending *295 Charlotte's Master Agreement "inclusive of all existing terms and conditions along with the State[-]specific terms and conditions incorporated with this offer"; (2) "provid[ing] the State with the lowest `tiered' level pricing under [the Master Agreement] (Level 4 = AutoZone best Zone pricing less 20%)"; (3) making "[a]ll State pricing . . . inclusive of shipping charges to `in-state' destinations"; and (4) delivering "stocked" items within twenty-four hours of the order during normal business hours, "non-stocked" items within three days of order during normal business hours, and "special order" items "within mutually agreed upon time periods." AutoZone also "highlight[ed]" various clauses that would be "incorporated" from the Master Agreement, including the delivery schedule for stocked items.
On March 27, 2008, DPP entered into a five-year statewide contract, Contract A71188, with AutoZone New Jersey for supplying automotive parts and accessories for light duty vehicles beginning on April 15, 2008, and ending on June 25, 2011, with an estimated total of $13 million (AutoZone Contract). According to the Notice of Acceptance, "THE CONTRACT DISCOUNT MUST BE APPLIED TO AUTOZONE'S BEST ZONE (TIER 4) PRICING, WHICH IS INCLUSIVE OF SHIPPING AND ALL OTHER CHARGES." (Emphasis added). Also, the unit price or percent discount applied would be twenty percent, and delivery would "BE MADE WITHIN 003 DAYS ARO [after receipt of order] UNLESS SPECIFIED DIFFERENTLY ON EACH LINE OR UNLESS AN ALTERNATE DELIVERY SCHEDULE IS INDICATED." No separate alternative delivery schedule was attached. In other words, New Jersey received the maximum discount (20%) from AutoZone's lowest zone price offered under the Master Agreement (Tier 4) and free shipping for all orders.
The Department of Treasury announced the contract in a press release dated March 27, 2008. According to that release, New Jersey had purchased auto parts for its fleet of 15,000 vehicles and equipment in the past "through a network of 135 vendors." It explained that the AutoZone Contract would allow New Jersey "to purchase these parts at a 20 percent savings from the current contract pricing," which will "save about $1.5 to $2 million in FY 2009."
"In addition to the cost savings," the press release stated that the "[AutoZone Contract] provides for advantages in ordering, delivery, customer service quality and technology compared to the State's previous contracts." That is:
Under the terms of the new contract, the auto parts will be supplied by AutoZone, which has a network of more than 60 stores throughout New Jersey. The company will stock and operate an in-house AutoZone store for the Department of Transportation at no extra cost to the State, and has made commitments to deliver stocked parts to State agencies and local governments within faster time frames compared to the existing contract.
Appellants Beyer Brothers Corp., PNCFLM, L.L.C., and Bob Novick Chevrolet, were three of 135 vendors who supplied auto parts to the State under contracts that expired on April 20, 2008. They filed a protest with the Director on April 29, 2008. They requested the award be set aside or a hearing be conducted pursuant to N.J.A.C. 17:12-3.3.[2] Appellants *296 also requested a stay of the termination of their existing contracts.
On June 12, 2008, the Director denied their protest and the application for a stay. In doing so, she held that appellants had no standing to protest the award because they had not submitted a bid. Nevertheless, she addressed the merits of the protest. She stated that the AutoZone Contract complied with State law. She rejected the contention that the agency was required to adopt regulations to effectuate the authority granted to her and the agency by the Legislature. The Director also found that the Master Agreement had been competitively bid. As to the review required prior to award, the Director stated that she had reviewed the Master Agreement with DPP staff. She rejected the notion that DPP must approve the specifications of the Master Agreement prior to initiation of the out-of-state competitive bid process. She also declared that the contract price terms were not "`illusory, illegal and subject to vendor manipulation'" or "`based upon undefined competitive zones.'" In fact, the Director noted that the price terms of the AutoZone Contract were similar to the recently expired auto parts contract, and the pricing mechanism is "based upon a firm, fixed discount applied to an agreed upon list price applicable to each automotive part and accessory that falls within the scope of the contract."
The Director also declared that the agency had not violated the Master Agreement or State statute by negotiating terms different from and more favorable than the base Master Agreement. She noted that the MICPA, the RFP and the Master Agreement expressly contemplated different and more favorable terms could be negotiated with other public entities. Moreover, the Master Agreement also requires that a more favorable term negotiated by a public agency must be made available to other participating similarly situated public agencies. The Director emphasized that the State did not receive a better price but did receive the best price under the Master Agreement through an agreement that all participating public entities in this State would be considered a single zone, thereby qualifying for the most favorable pricing.
Appellants filed a timely notice of appeal naming only DPP as respondent. On September 23, 2008, they filed an amended notice of appeal naming AutoZone as a respondent.
On appeal, appellants argue that the Director exceeded her authority under N.J.S.A. 52:34-6.2 by negotiating a separate contract with AutoZone that did not conform to the terms of the Master Agreement; that the contract with AutoZone is ultra vires because it contains wholly new terms not mandated by New Jersey law or found in the Master Agreement; the procurement process by Charlotte was not the product of competitive bidding; and the AutoZone Contract is not in the best interests of the citizens of the State of New Jersey.
The Director responds that appellants lack standing to challenge the contract, and the appeal should be dismissed. AutoZone supports this position. AutoZone also argues that the appeal should be dismissed because it did not receive timely notice of the appeal. The Director and *297 AutoZone also contend that New Jersey did not receive terms different from the Master Agreement and any terms negotiated by the Director are consistent with the terms of the Master Agreement. They also argue that the record fully supports the Director's conclusion that the AutoZone Contract was "the most cost-effective method of procurement."

II
AutoZone contends that it did not receive timely notice of the appeal of the contract award. It was not a party to the protest filed by appellants with the Director. As such, when appellants filed a notice of appeal from the Director's June 12, 2008 final decision on July 25, 2008, they served only the Director and the Attorney General. They amended their notice of appeal on September 23, 2008, to name AutoZone.
By order dated March 31, 2009, this court denied AutoZone's motion to dismiss the appeal. We do not question that AutoZone is an interested party because disposition of this appeal affects its contract with the State. Nevertheless, we consider the March 31, 2009 order the law of this case and will not disturb the disposition by another panel of this court to allow this matter to proceed.

III
The Director and AutoZone argue that we should dismiss the appeal because appellants lack standing to challenge the AutoZone contract. The Director found that appellants lacked standing to challenge the contract because neither Beyer Brothers Corp., PNCFLM, L.L.C., or Bob Novick Chevrolet, the corporate appellants, nor New Jersey Coalition of Automotive Retailers, the association appellant, had participated in the procurement conducted by Charlotte.
On appeal, the Director reiterates that appellants were not bidders to the original RFP because the procurement process was conducted by Charlotte not the DPP. The Director also emphasizes that appellants were not eligible to bid on the RFP because they are local suppliers unable to participate in a regional, let alone a national, cooperative procurement scheme. Furthermore, she contends that appellants have not alleged a specific economic harm or interference with their current business and have no significant public interest at stake. In fact, the Director argues that this appeal demonstrates that appellants do not have the interests of the citizens of this State in mind because the AutoZone Contract provides better prices and more favorable delivery terms than they could provide.
The corporate appellants respond they have standing because they held the previous State auto parts contract, are taxpaying businesses, will lose significant profits due to the AutoZone Contract, and are members of the appellant association. Moreover, they contend they would have participated in the auto parts procurement, if the Director had solicited bids rather than participated in the cooperative purchasing scheme.
Our courts have traditionally taken a generous view of standing in most contexts. Crescent Park Tenants Ass'n v. Realty Equities Corp. of N.Y., 58 N.J. 98, 107-12, 275 A.2d 433 (1971); N.J. Builders Ass'n v. Mayor & Twp. Comm. of Bernards Twp., 219 N.J.Super. 539, 530 A.2d 1254 (App.Div.1986), aff'd, 108 N.J. 223, 528 A.2d 555 (1987). In 1971, Justice Jacobs emphasized the critical difference between the federal approach to standing and that employed in this State; he wrote:
Without ever becoming enmeshed in the federal complexities and technicalities, *298 we have appropriately confined litigation to those situations where the litigant's concern with the subject matter evidenced a sufficient stake and real adverseness. In the overall we have given due weight to the interests of individual justice, along with the public interest, always bearing in mind that throughout our law we have been sweepingly rejecting procedural frustrations in favor of "just and expeditious determinations on the ultimate merits."
[Crescent Park, supra, 58 N.J. at 107-08, 275 A.2d 433 (quoting Tumarkin v. Friedman, 17 N.J.Super. 20, 21, 85 A.2d 304 (App.Div.1951), certif. denied, 9 N.J. 287, 88 A.2d 39 (1952)).]
In the context of public bidding, however, this State has adopted a considerably less generous standing rule. A prospective bidder may challenge the specifications of a public contract, but only taxpayers and bidders may challenge the award of a contract to a successful bidder. Jen Elec., Inc. v. County of Essex, 197 N.J. 627, 644, 964 A.2d 790 (2009). Recently, while re-affirming the limitation on those who may challenge the award of a contract by a public contracting authority, the Court also examined the scope of those who have standing to challenge bid specifications issued by a public entity. Id. at 644-47, 964 A.2d 790.
In Jen Electric, the Court interpreted a recent amendment to a public contract statute, N.J.S.A. 40A:11-13, as adding a limitations period for challenging specifications issued in the public contract process rather than as a limitation on those who may challenge the specifications. Id. at 631, 640-44, 964 A.2d 790. In the course of its discussion, the Court also held that traditional notions of standing govern who may challenge the specifications issued by a public entity for a public contract. Ibid. That is, only prospective bidders had standing to challenge the specifications of a request to bid. Id. at 642-44, 964 A.2d 790. Then, the Court held that a potential supplier that met the needs of the proposed public project had standing to challenge specifications issued by a public contracting body. Id. at 646-47, 964 A.2d 790. The Court also stated that a contractor or supplier who is "in the process of reviewing and evaluating the bid specifications" is a prospective bidder. Id. at 643, 964 A.2d 790. Moreover, as "the provider of equal, alternate equipment that would be responsive to a generic, but not sole-source, bid, plaintiff possessed a sufficient stake in the outcome of this litigation." Id. at 646, 964 A.2d 790. The Court noted that the plaintiff's efforts to challenge the specifications over two bid cycles demonstrated "real adverseness." Ibid. The plaintiff was "an active, indeed pro-active participant in the bidding process, and the majority of its concerns addressed core principles of public contracting." Ibid.
In closing, the Court restated the rule for assessing standing for those who seek to challenge bid specifications. The Court stated:
Thus, the common law development of whether a plaintiff has standing is subject to the following test: "In passing upon a plaintiff's standing the court is properly required to balance conflicting considerations and weigh questions of remoteness and degree." [Al] Walker[, Inc. v. Stanhope], 23 N.J. [657,] 661, 130 A.2d 372 [(1957)]. Those principles, therefore, mandate that nothing in this opinion shall be construed as subjecting bid specifications to challenge other than from those with a clear, identifiable, substantial, and real interest in the outcome of that challenge.
[Id. at 647, 964 A.2d 790.]
*299 With these principles in mind, we determine whether appellants have standing to challenge the AutoZone Contract.
The nature of the procurement process must inform our application of these principles. The cooperative procurement process authorized by the Legislature and utilized by the Director does not allow application of the traditional prospective bidder and disappointed bidder categories. Here, the procurement process provides no notice to current suppliers or prospective suppliers of the State's current and future needs and its intention to return to the market for suppliers of required products. The notice issued by the Director that the State had awarded a contract to AutoZone to supply auto parts to public users in this State was the first notice that the Director sought a new supplier and that she was utilizing the alternative cooperative procurement process. As such, no one, and certainly not the current suppliers or the association representing those suppliers, had any opportunity to receive and review specifications for the parts required by the State. Furthermore, neither the existing suppliers and their association, nor any other supplier of auto parts in this State had the opportunity to submit a bid as the Director decided to piggyback on the earlier Charlotte RFP and Master Agreement. In other words, appellants and others in their position had no opportunity to position themselves to challenge the specifications or the contract award in accordance with the established law on public contract protests.
Appellants certainly do not have a continuing right to be a supplier of auto parts to the State. The corporate appellants participated in a prior competitive bid process, won the awards and obtained a contract for a definite term. They had no guarantee that they would emerge as the successful bidders in any subsequent round of competitive bids. They also had no guarantee that the State would continue to look only within its borders for suppliers of generic parts or equipment, such as auto parts. Nevertheless, as holders of the most recent contracts for such equipment, the corporate appellants have the most direct financial interest in the procurement process used by the State to meet its needs for these items. It is these suppliers who had direct knowledge of the duration of their contracts, the terms under which they had agreed to provide auto parts to the State, and the need for the State to return to the market to procure these items in the future. The loss of this business gives them a more acute interest in the procurement process utilized by the State. Their knowledge of the needs of the procuring authority derived through actual performance of the prior contract places them in a unique place to provide constructive criticism of the Director's analysis of the benefits of the Master Agreement. Appellants are more than "mere[] interlopers or strangers to the dispute." Crescent Park, supra, 58 N.J. at 107, 275 A.2d 433. Appellants also raise significant issues that address the integrity of our public bidding process.
Finally, we cannot ignore the effect of the Director's position. Her position would lead to the result that no party would have standing to challenge the specifications of a contract awarded by another public entity or a contract awarded through the cooperative procurement process. In an area so infused with the public interest, we cannot insulate this important function from judicial review no matter how wise, experienced and diligent the Director may be. In short, we hold that appellants have standing to challenge the award of the AutoZone Contract.[3]
*300 In order to timely and effectively assert their acknowledged interest, however, current contract holders or those who qualified to submit a bid on an upcoming RFP and anticipated doing so, must have notice that the Director intends to utilize the collective purchasing authority provided by statute. In the area of procurement, timeliness is critical to assure that the State's needs for goods and services at competitive prices are met. After-the-fact challenges are often counterproductive. Therefore, once the Director determines to investigate use of the collective purchasing authority, notice must be given to current contract holders and qualified bidders to meet State needs for particular supplies, materials or services in order to allow timely challenges to the decision to utilize the collective purchasing process and the ultimate decision that the collective purchasing process will meet the statutory standard of "the most cost-effective method of procurement." N.J.S.A. 52:34-6.2b(2).

IV
Addressing the merits, we turn to the argument that the Director exceeded her authority to enter into a cooperative purchasing agreement through a contract awarded by another public entity. Appellants contend that the AutoZone Contract is actually the product of separate negotiations with AutoZone without benefit of competitive bidding rather than the purported participation in a cooperative procurement program. Specifically, appellants highlight three provisionsfree delivery, an in-house store of auto parts, and a 20% price discountas illustrative of the divergence between the AutoZone Contract with the State and the Master Agreement as proof that the contract cannot be considered an adoption of the Charlotte contract. We disagree.
As a preliminary matter, we note that the contract between the State and AutoZone makes no reference to creation and maintenance of an in-house auto parts store. In fact, the only reference to that feature was in the Director's press release announcing the award of the contract to AutoZone. Moreover, there is no other reference in the record to the existence of this feature, and the Notice of Acceptance expressly provides for three-day delivery, unless otherwise specified in the Master Agreement.
The Master Agreement also expressly provides a range of possible discounts between five and twenty percent. The Master Agreement expressly pegs the discount to volume. Here, the contract between the State and AutoZone provides that AutoZone will give New Jersey and all participating public entities in this State a flat twenty percent discount as contemplated by the Master Agreement. We assume this pricing is a function of anticipated volume. However, the Master Agreement provides that a fifteen percent discount will be applied for sales volume between $10 million and $20 million, and the Director announced an estimated volume of $13 million. The record does not explain this disparity.[4]
*301 Consequently, the only difference between the Master Agreement and the AutoZone Contract is the free delivery term. Our review of the Master Agreement suggests that such a deviation or modification is permissible and that the law governing State procurement contracts authorized the Director to seek and to obtain such a modification. Moreover, the presence of over sixty stores in this State undoubtedly makes this service an eminently feasible delivery option.
Paragraph 5.6 of the Master Agreement provides that no state or local public agency "with the same payment terms, volume, delivery terms and other conditions" will receive the products provided through the agreement at a lower net price. This provision suggests that there will be some variance among participating states and local public agencies and the language certainly does not preclude a variance in some terms, such as different delivery terms. This provision simply provides that there shall be no term variance for those participating agencies with the same terms.
The Master Agreement specifically addresses delivery and freight. It provides that "all orders shall be shipped F.O.B. Destination . . . [and a]ll orders placed by the City or any Participating Public Agency shall be delivered by the methods and within the times specified in Exhibit C." This exhibit states that AutoZone was presently using Fed Ex Ground, but it contains no prices due to a confidentiality provision in the agreement between AutoZone and Fed Ex. Moreover, Exhibit C further states that delivery would "be priced as needed to meet the needs of the Customer location." This language indicates that further negotiations might occur between AutoZone and public agencies that adopted the Master Agreement.
Moreover, even in traditional bidding cases, our courts have approved post-bid modifications to an awarded public contract when the public entity negotiates more favorable terms. In Palamar Construction, Inc. v. Township of Pennsauken, 196 N.J.Super. 241, 250-53, 482 A.2d 174 (App.Div.1983), this court held that two post-bid conditions added to an awarded contract did not violate the general rule that the resulting contract must not deviate from the published RFP, because those conditions placed the winning bidder "in a less favorable, and possibly more expensive, position." Id. at 251, 482 A.2d 174. Also, in Greenberg v. Fornicola, 37 N.J. 1, 9-11, 178 A.2d 339 (1962), the Court upheld post-bid changes to an awarded merchant lease, declaring that "[i]t would be unreasonable to construe [the bidding statute] to deny to the municipality an opportunity to bargain for a needed change." Id. at 10, 178 A.2d 339.
Finally, N.J.S.A. 52:34-6.2 does not expressly prohibit the Director from negotiating better terms than those in the cooperative purchasing agreement. In fact, because it allows the Director to enter such an agreement "whenever the director determines this to be the most cost-effective method of procurement," N.J.S.A. 52:34-6.2 implicitly allows the deviations made here on delivery terms.
According to its legislative history, the purposes of the statute are: (1) to "enable New Jersey to benefit from procurements which are most cost-effective because of volume purchasing, standardized specifications, and increased leverage in the marketplace," Statement to A. 182, *302 supra; and (2) to "increase the State's range of purchasing options and enable the State to realize cost savings by eliminating the need for a separate bidding process for goods and services that have already been competitively bid by other states with similar interests and fiscal restraints," Statement to S. 2194, supra. Negotiation of the most favorable terms contemplated by the Master Agreement achieves those purposes.
In addition, appellants contend that the AutoZone Contract must be set aside because Charlotte's underlying procurement was not a competitive bidding process as required by N.J.S.A. 52:34-6.2. That is, they argue that Charlotte's procurement procedures, which led to the Master Agreement, and ultimately to the AutoZone Contract, violated New Jersey's standards for fair and open competition set forth in N.J.S.A. 52:34-12, since only four suppliers were invited to bid, as contrasted to the 135 vendors that had bid on and held New Jersey's previous auto parts contract. They also point out that Charlotte never indicated what criteria it had used to select those four vendors, and they assert that it should have advertised "in a national newspaper," instead of in a local paper and on the internet, "to combat [its] selective invitation to bid."
Appellants also complain that there are no definitional guidelines in N.J.S.A. 52:34-6.2b(2) or in any corresponding regulations as to the meanings of "nationally-recognized and accepted cooperative purchasing agreement" and "competitive bidding process." In addition, they argue that there are no publicly available records to indicate whether the Director reviewed and approved Charlotte's specifications and the Master Agreement prior to entering into the AutoZone Contract.
As related by the Director in her decision, although Charlotte directly solicited four bidders to respond to its RFP, it advertised on the internet and in the newspaper. Also, U.S. Communities advertised the RFP on its website, which was accessible to all of its registered vendors and public entities. Indeed, there is no indication in the record of any vendor that could have responded but did not due to lack of notice. Internet and newspaper advertisement of RFPs is consistent with the practice in this State. N.J.S.A. 52:34-12a.
Finally, we, like the Director, find that no implementing regulations were required to define "nationally-recognized and accepted cooperative purchasing agreement" and "competitive bidding process," because N.J.S.A. 52:34-6.2 is clear on its face as to their meanings.
Appellants also contend that the Director's decision to enter into the AutoZone Contract was arbitrary, capricious, unreasonable and an abuse of discretion because AutoZone's pricing standards are unclear since they are based on the "undefined standard of `competitors in the zone.'"
In response, the Director asserts that Charlotte had "originally evaluated AutoZone's offered prices" and that "[i]t must be presumed that the underlying procurement by the City of Charlotte was legal and that the City reasonably determined that AutoZone's lowest zone prices were acceptable under the terms of the RFP." The Director also claims, without more, that appellants' "suggestion that the Director entered into the [AutoZone] Contract without comparing AutoZone's prices with the prices under the current contract has no basis in fact."
AutoZone explains that its "Lowest Zone" pricing was developed as part of its response to Charlotte's RFP, that it "has different pricing zone[s] across the country," and that the "Lowest Zone . . . reflects *303 the lowest price available in any of AutoZone's pricing zones for each of its more than 800,000 products."
Initially, we note that there was nothing in Charlotte's RFP or the Master Agreement that required prices to be based on a manufacturer's price list. Furthermore, the Director declared in her decision that she had seen "a firm lowest-zone price list or schedule applicable to all purchases executed on the basis of [the AutoZone Contract], effective for the full, first year of the contract, ending April 14, 2009," and found that the State was "likely to derive savings in the aggregate of at least 20% compared to the terms and conditions of the previous contract."
We note, however, that the latter statement, as well as the Director's statement that she compared AutoZone's prices with the prices under the current contract, are bald conclusions. There is nothing in the record to support these statements. We are asked to blindly accept that Charlotte "reasonably determined that AutoZone's lowest zone prices were acceptable." There is nothing in the record to support the Director's finding that the AutoZone Contract was "the most cost-effective method of procurement" as required by N.J.S.A. 52:34-6.2. There is no information in the record showing what list the Director reviewed or what that review involved. In fact, it is not clear from AutoZone's "zone" formula what prices it actually offered New Jersey before entering into the AutoZone Contract, or how the Director decided whether those prices, including free delivery, were more cost effective than the ones from the previous contracts. She offered no detailed explanation.
In addition, AutoZone's bid did not list any specific prices on Exhibit A, entitled "PRICING FORM," and there is no price list or "zone" list in the record or on any website we could find. Indeed, it appears that AutoZone uses different prices for each participating agency. That is, it stated at the end of Exhibit A that its
pricing is determined by the competition in any given market. Where [AutoZone] is positioned in a market where there are multiple competitors[,] the pricing will be less expensive to the consumer. [AutoZone] has developed multiple pricing "Zones" as a result of this process.
Our standard of review is restricted to a determination of whether the Director's decision to award the auto parts supply contract to AutoZone is founded on "bad faith, corruption, fraud or gross abuse of discretion." Commercial Cleaning Corp. v. Sullivan, 47 N.J. 539, 549, 222 A.2d 4 (1966); In re Jasper Seating Co., 406 N.J.Super. 213, 222, 967 A.2d 350 (App.Div.2009). In order to perform that review, the record must contain the relevant information for us to perform our review function. This record does not permit us to do so.
We recognize that the Director who participated in this procurement has retired. Nevertheless, specific findings of fact must be made and the administrative record must reflect the material that forms the basis of the decision-making in this case. We, therefore, remand for further findings of fact as to the Director's ultimate conclusion that the Master Agreement and the AutoZone Contract offer the most cost-effective procurement option for this material. Upon completion of the remand, a supplemental record shall also be forwarded to this court. To the extent any of the elements of the supplemental record contain proprietary information, the supplemental record may be filed under seal. The supplemental findings and supplemental record shall be filed within thirty days of the date of this opinion.
*304 Remanded for findings of fact. We retain jurisdiction.
NOTES
[1] N.J.S.A. 30:4-95.
[2] After submitting a proposal in response to an RFP, a vendor may protest the rejection of its proposal or the award of a contract pertaining to the subject procurement. N.J.A.C. 17:12-3.3. The protest must be submitted in written form to the Director within ten days of the vendor receiving written notice of its rejected proposal or the award of a contract or intended award. Ibid. The Director may choose to issue a written decision in response to the protest or to hear oral presentations by the protestor before issuing a written decision. Ibid.
[3] We also reject the notion that appellants lack standing because they did not challenge the master contract bid and awarded by Charlotte. As related in this opinion, Charlotte advertised the contract on March 2006 and awarded the Master Agreement in June 2006; the Director did not announce her intention to piggyback on this contract until March 2008. Without prior notice to appellants or the public in general that it was her intention to piggyback on the Charlotte contract at the time of the award of the Master Agreement, appellants would truly have been considered interlopers and strangers to the dispute.
[4] The Master Agreement allows a participating public entity to negotiate better terms than the Master Agreement. If it does so, however, AutoZone must offer the same terms to similarly situated public entities.